Bobby R. GIPSON, Petitioner,

v.

**VETERANS ADMINISTRATION and the United States, Respondents.**

No. 81–1933.

United States Court of Appeals, District of Columbia Circuit.

Argued April 27, 1982.

Decided July 13, 1982.

Harry Toussaint Alexander, Washington, D. C., for petitioner.

Wayne P. Williams, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, Royce C. Lamberth, Kenneth M. Raisler and Michael J. Ryan, Asst. U. S. Attys., Washington, D. C., were on the brief, for respondents.

Before EDWARDS and BORK, Circuit Judges, and DUDLEY B. BONSAL, United States Senior District Judge for the Southern District of New York.*

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (Supp. IV 1980).

HARRY T. EDWARDS, Circuit Judge:

In this case, we are called upon to review a decision of the Merit Systems Protection Board ("MSPB") upholding the termination of the petitioner, Bobby R. Gipson, from his position in the Veterans Administration. For the reasons set forth below, we conclude that the MSPB proceedings were not procedurally infirm, that the decision of the MSPB sustaining the charges against Gipson was supported by substantial evidence, and that the MSPB correctly held that Gipson's discharge was not an excessive punishment or the product of improper motives. We therefore affirm the MSPB decision.

## I. BACKGROUND

### A. *Factual Background*

Most of the facts relevant to this case are uncontroverted. The petitioner, Bobby R. Gipson, was the Rehabilitation Medicine Service Coordinator at the Veterans Administration Medical Center in Washington, D.C. from October 1975 until his termination in April 1979. In this position, Gipson served as the administrative assistant to the Chief of the Rehabilitation Medicine Service ("RMS"), Dr. Herman L. Kamenetz. According to Gipson's Position Description, his "primary responsibility [was] the supervising and coordinating of all administrative activities of the Rehabilitation Medicine Service, [and] assisting the Chief of RMS in accomplishing overall management of this service...." A.R. 143.[1] Included among these responsibilities were jobs dealing with the development and implementation of policies and procedures for RMS and the coordination of patient treatment schedules with the various Section Chiefs in RMS. Thus, Gipson had considerable responsibility for and authority over the operation of the Service, which provided physical and occupational therapy for patients

1. "A.R." refers to the volume of documents in the certified administrative record compiled during the petitioner's appeal to the Merit Systems Protection Board.

coming from various units within the hospital.

Gipson's job responsibilities, however, did not include duties as a therapist or as a physician. (He lacked the necessary accreditations for either position.) For a few months in 1978, Gipson had occasionally acted as a therapist in two of the hospital's wards; however, after officials in the Office of the Chief of Staff learned of Gipson's activities in September 1978, he was specifically directed to cease any therapeutic duties. Tr. II 78.[2]

Hospital rules governing RMS required that patients be referred to the Service by a physician, and in normal circumstances a written referral had to precede any therapy. A.R. 132. Hospital rules further required that the consultation sheets, by which referrals to RMS were made, could be requested and answered "only by residents, staff physicians, consultants or attendings." A.R. 116. In addition, the consultation sheets could be signed only by the responsible physician. *Id.*[3] The Employee Health Physician at the Medical Center could refer hospital employees to RMS by a similar procedure. A.R. 138.

In late 1978, Gipson was approached by Lorenzo Leak, a hospital employee suffering from osteoarthritis. Leak desired to use the RMS therapeutic swimming pool[4] after working hours. Gipson gave Leak permission to use the pool and—so that

Leak could have access to the pool after RMS closed—Gipson gave Leak keys to the Service. Another hospital employee, Joseph Lloyd, also approached Gipson about using the RMS pool in November 1978. Because Lloyd was partially disabled by cerebral palsy, Gipson gave Lloyd permission to use the pool only after arranging with Clyde Burnett, another employee, to swim with Lloyd. (Several years earlier, Burnett had held a Red Cross water safety certificate.) As he had with Leak, Gipson gave Burnett and Lloyd a set of keys to RMS so that they could use the swimming pool after hours.

At 8:10 p.m. on January 30, 1979, hospital police officers found Leonard Leak in the RMS swimming pool. Mr. Leak, who was neither an employee nor a patient at the hospital, explained that he was waiting for his brother Lorenzo to meet him. The police confiscated his keys and filed a report. The next day, hospital administrators learned that Lorenzo Leak had obtained the keys from Gipson and that Gipson had also issued keys to Burnett and Lloyd.

On January 31, 1979, Dr. Kamenetz and Clyde Corsaro, the Assistant Medical Center Director, interviewed Gipson. The petitioner admitted that he had given the cited employees permission to use the pool after hours and had issued them keys to RMS for that purpose. He asserted to his superiors, however, that he had consultation sheets approving the use of the RMS pool by Lor-

---

**2.** "Tr. I" and "Tr. II" refer to the transcripts of the evidentiary hearing conducted by the MSPB Presiding Official on June 18, 1980 and June 19, 1980, respectively.

**3.** These Medical Center regulations were consistent with the requirements of the Joint Commission on Accreditation of Hospitals ("JCAH"). The JCAH required, *inter alia,* that rehabilitation services be prescribed by a physician; that a current, written plan be maintained for each patient receiving rehabilitative services; and that physical therapy be administered by a qualified physical therapist. Joint Committee on Accreditation of Hospitals, Accreditation Manual for Hospitals 155, 156, 158 (1979), *reprinted in* A.R. 125, 126, 128. The Accreditation Manual for Hospitals also limited the therapeutic responsibilities of administrative personnel:

When administrative direction is not the responsibility of a physician, it shall be provided by another qualified individual who is responsible to the chief executive officer [of the rehabilitative program/service]. The assignment of a nonphysician as administrative head of the program/service does not imply that nonphysicians have been given authority to perform medical procedures without medical supervision, to assume professional responsibilities of physicians, or to practice of [sic] medicine.

*Id.* at 154, A.R. 124.

**4.** The RMS swimming pool was termed "therapeutic" because it was heated to approximately ninety degrees Fahrenheit. As far as the record reveals, this is the principal difference between it and an ordinary swimming pool.

enzo Leak and Joseph Lloyd.[5] After this interview, Gipson prepared consultation sheets for Lorenzo Leak and Joseph Lloyd, backdated them to December 1 and 7, 1978, and then took them to Margaret Durham, a nurse to Dr. Kenmore.[6] Nurse Durham signed Dr. Kenmore's name on the backdated consultation sheets. Gipson then presented these backdated consultation forms to the Assistant Medical Center Director as proof of Dr. Kenmore's approval for Leak's and Lloyd's use of the RMS pool.[7]

On March 7, 1979, Dr. Kamenetz proposed Gipson's discharge from employment on the basis of five charges: (1) issuing keys to RMS to Lorenzo Leak without authority; (2) granting Lorenzo Leak permission to use the RMS pool for therapeutic purposes without professional supervision and without a physician's orders; (3) granting Joseph Lloyd permission to use the RMS pool for therapeutic purposes without professional supervision and without a physician's orders; (4) issuing keys to RMS to Clyde Burnett and Joseph Lloyd without authority; and (5) falsifying the consultation sheets of Lorenzo Leak and Joseph Lloyd. A.R. 36–37. By letter dated March 26, 1979, the Medical Center Director advised Gipson that the charges were upheld and that his employment would be terminated effective April 13, 1979. A.R. 35.

## B. MSPB Proceedings

Gipson appealed his removal to the Merit Systems Protection Board. After Gipson's counsel requested several continuances, the MSPB Presiding Official, Elizabeth B. Bo-

gle, refused to postpone the proceedings further and decided Gipson's appeal based on the parties' written submissions. Presiding Official Bogle sustained each of the five charges against Gipson and his resulting removal. *Gipson v. Veterans Administration*, 1 M.S.P.B. 422 (1979). The MSPB vacated this decision, ruling that good cause existed for rescheduling the hearing and that the case therefore should not have been decided without an evidentiary hearing. *Gipson v. Veterans Administration*, 1 M.S.P.B. 420 (1980); *see* 5 U.S.C. § 7701(a) (Supp. IV 1980).[8]

Subsequently, on June 18 and 19, 1980, Presiding Official Bogle conducted an evidentiary hearing. At the outset of the hearing, the Presiding Official denied Gipson's motion that she recuse herself on grounds of bias. Based upon the parties' written submissions and upon two days of testimony, the Presiding Official again found that the charges against Gipson were supported by a preponderance of the evidence and that his removal was warranted. In addition, the Presiding Official rejected Gipson's claims that his discharge was the result of discrimination or in retaliation for "whistle-blowing." *Gipson v. Veterans Administration*, Docket No. DC075209249 (M.S.P.B. Sept. 10, 1980); A.R. 235–39. The MSPB reviewed the Presiding Official's decision and affirmed on all grounds. *Gipson v. Veterans Administration*, Docket No. DC075209249 (M.S.P.B. July 17, 1981); A.R. 259–64.

Gipson has here petitioned for review of the MSPB Opinion and Order. This court has jurisdiction over this appeal pursuant to 5 U.S.C. § 7703 (Supp. IV 1980).

---

5. Petitioner did not claim to have consultation sheets for Clyde Burnett or Leonard Leak.

6. Dr. Kenmore was a staff physician at the Medical Center.

7. Beyond these facts, some dispute exists about the consultation sheets. Gipson claims that they were replacements for forms on which Nurse Durham previously had signed Dr. Kenmore's name in December 1978. Tr. II 28–30. Assistant Director Corsaro's notes of his interview with Nurse Durham, on the other hand, make no mention of her signing consultation sheets for Leak and Lloyd in December: ac-

cording to the interview notes, Nurse Durham only admitted signing Dr. Kenmore's name for Gipson on January 31, 1979. A.R. 43. Corsaro's notes also indicate that Dr. Kenmore "disclaimed any knowledge" of signing consultation sheets for Lloyd or Leak. A.R. 46. Neither Dr. Kenmore nor Nurse Durham testified in the MSPB proceedings. *See* Part II–B–3 *infra*.

8. The MSPB also ruled that the Presiding Official had failed to address the allegation of discrimination that Gipson raised in his appeal.

## II. ANALYSIS

 The standards for judicial review of MSPB decisions are familiar ones. Under the Civil Service Reform Act, we are required to "review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be—(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence...." 5 U.S.C. § 7703(c) (Supp. IV 1980).

Gipson raises four distinct challenges to the MSPB decision. He argues that the bias of the Presiding Official denied him a fair hearing, that the MSPB decision sustaining the charges against him was not supported by substantial evidence, that the penalty of removal was clearly excessive, and that the actions of officials at the Veterans Administration were the product of improper motives. As indicated below, none of these challenges is supported by the record in this case.

### A. Bias of the Presiding Official

 The petitioner renews before this court his argument that Presiding Official Bogle was biased and that he was therefore deprived of his right to a fair hearing. The MSPB did not err in rejecting this argument. First, the contention that Presiding Official Bogle should have been disqualified from conducting the evidentiary hearing and deciding Gipson's appeal because the MSPB had vacated her previous ruling against Gipson is plainly without basis. Agency officials are not disqualified from conducting a second proceeding involving a party merely because they have ruled against that party previously. *NLRB v. Donnelly Garment Co.*, 330 U.S. 219, 236–37, 67 S.Ct. 756, 765, 91 L.Ed. 854 (1947).

 Second, petitioner's contention that the Presiding Official was somehow biased in her conduct of the hearing is wholly unsupported. Our review of the hearing transcript reveals that Presiding Official Bogle showed remarkable restraint in the face of rude and arrogant behavior by petitioner's counsel, Mr. Alexander. The record is replete with insolent outbursts, contemptuous remarks and hubristic responses addressed to both witnesses and the Presiding Official by attorney Alexander. This conduct of counsel far exceeded the bounds of legitimate advocacy and was generally well short of the decorum expected of a member of the bar. In this context, counsel's claim of bias on behalf of Gipson is patently specious.

### B. The Charges Against Gipson

#### 1. Unauthorized Issuance of Keys

 Although petitioner frames his attack on the MSPB decision sustaining the charges against him as a challenge to the substantiality of the evidence, he nevertheless concedes the essential facts of the first and fourth charges. He admits that he gave keys to RMS to Lorenzo Leak, Joseph Lloyd and Clyde Burnett so that they might use the RMS swimming pool after hours. Petitioner claims, however, that he had been delegated *carte blanche* authority to issue keys to RMS and that no hospital regulations prohibited him from doing so. In support of the former claim, Gipson cites a May 20, 1976 memorandum written by Dr. Kamenetz, the Chief of RMS. The memorandum states: "The responsibility for controlling keys and the authority to originate all key requests is hereby delegated to B.R. Gipson, Administrative Assistant, RMS." A.R. 12.

The MSPB correctly rejected these arguments. The MSPB could properly interpret the May 20, 1976 memorandum as giving Gipson less than unbridled discretion over the issuance of keys to RMS. Notably, the memorandum explicitly granted Gipson the *"responsibility* for controlling keys" as well as the authority to issue them. In addition, the record contains substantial evidence of security problems in and around RMS and indicates that RMS was re-keyed several times during Gipson's tenure at the hospital because persons outside RMS had obtained keys to the Service. A.R. 13; Tr. II 33. In

these circumstances, it was plainly not irrational for the MSPB to conclude, as the Veterans Administration had charged, that Gipson's issuance of keys to persons outside the Service for their unsupervised, personal use of the RMS pool was an imprudent exercise of Gipson's responsibility and discretion. Gipson could therefore be subject to discipline, even though his actions may have violated no specific hospital regulation.

### 2. *Unauthorized Use of the RMS Pool*

■ Gipson also concedes the essential facts of the second and third charges. He admits that he gave permission to Leak and Lloyd to use the RMS swimming pool for therapeutic purposes, that Leak and Lloyd had not been referred to RMS by a physician, and that their use of the pool was not supervised by a therapist. Gipson gave the employees permission to use the swimming pool even though he was aware that one physician on the hospital staff had refused to approve their use of the pool. Tr. II 73 (testimony of Gipson). In addition, Gipson gave these employees permission to use the pool only a few months after he had been directed by the Office of the Chief of Staff to cease any therapeutic duties, for which he was unlicensed. Tr. II 78 (testimony of Gipson). In defense of his actions, Gipson argued before the MSPB that no hospital regulations prohibited the therapeutic use of the pool by Lloyd and Leak, that he was motivated by humanitarian purposes, and that other employees made use of the pool for recreational purposes.

Based on the record before it, the MSPB correctly rejected Gipson's arguments and sustained the charges of the Veterans Administration. First, while there was no specific hospital regulation concerning use of the RMS pool for therapeutic purposes, it is clear that hospital regulations did require a physician's referral for therapy in the RMS in general. A.R. 132. Furthermore, other hospital rules required that the consultation sheets, by which referrals to RMS were made, could be signed only by physicians. A.R. 116, 138. Second, humanitarian motives provided no excuse for permitting unsupervised therapy without a physician's approval. Finally, the MSPB could properly reject the occasional, unapproved recreational use of the pool as a viable justification for Gipson's actions.[9]

### 3. *Falsification of Medical Records*

The facts are somewhat less clear with regard to the fifth charge against petitioner. Gipson testified that he took consultation sheets for Leak and Lloyd to Nurse Durham in December 1978 and that Nurse Durham signed Dr. Kenmore's name to the forms. Because Leak and Lloyd would be using the RMS pool after hours, Gipson testified that he saw no reason to route the forms through the normal RMS office procedures. These original consultation sheets for Leak and Lloyd allegedly were subsequently lost in Gipson's office. According to Gipson, after he was confronted, on January 31, 1979, by Dr. Kamenetz and Assistant Director Corsaro about Leak's and Lloyd's use of the pool, he took new, backdated consultation sheets to Nurse Durham. He allegedly explained to her that the forms were backdated, and she signed Dr. Kenmore's name to them. Gipson then presented these replacement forms as proof of a physician's approval for Leak's and Lloyd's use of the RMS pool. Tr. II 28–30, 70–74.

In contrast, Assistant Medical Center Director Corsaro testified that, on the morning of January 31, 1979, Gipson claimed to have a physician's approval for Lloyd's and

---

**9.** Gipson was able to point to a few occasions on which the RMS pool was used for *recreational* purposes by some hospital employees. With the exception of the use of the pool by the hospital's police force for physical fitness purposes, these recreational uses apparently lacked official approval. Some evidence was introduced that this unauthorized use was quashed after its discovery by hospital officials. In any event, the MSPB could properly conclude that this unapproved recreational use did not constitute a practice which, even if firmly established, would justify Gipson giving Lloyd and Leak permission to use the RMS pool for unsupervised, unauthorized *therapy*.

Leak's use of the RMS pool. After Gipson produced the consultation sheets later in the day, Corsaro interviewed Nurse Durham, who admitted signing the forms that day. The dates on both forms, however, were from December 1978. Tr. I 227–30. In addition, Corsaro's unverified notes of his interview with Nurse Durham indicate that the nurse did not realize that the consultation sheets were backdated, and "she claimed she probably would not have signed the two consult sheets" had she realized that they were backdated. A.R. 43.

These versions of the events conflict in two significant respects. First, Gipson testified that he had obtained consultation sheets for Lloyd and Leak in December and that the forms signed by Nurse Durham on January 31 were only replacements for the misplaced originals. Corsaro's testimony and notes make no mention of original consultation sheets or of Nurse Durham signing them in December. Second, Gipson testified that he informed Nurse Durham that the consultation sheets he presented to her in January were backdated. Corsaro's notes of his interview with Nurse Durham indicate that she denied knowledge of the dates on the forms.

This court, were it required to do so, would face substantial difficulties in attempting to resolve these disparate stories. Much of Corsaro's hearsay testimony is in direct conflict with Gipson's sworn testimony. While admissible in the administrative proceeding, *Johnson v. United States*, 628 F.2d 187, 190 (D.C.Cir. 1980), this hearsay might not constitute "substantial evidence

to overcome the sworn testimony of a claimant," *McKee v. United States*, 500 F.2d 525, 528 (Ct.Cl.1974).[10] Additionally, the Presiding Official made no specific credibility findings regarding this testimony that would allow either the MSPB or this court to resolve the differences in the stories. We need not pause long over these problems, however, because the charge of falsifying medical records was properly sustained on the basis of Gipson's own version of the relevant events.[11]

Under Gipson's version of the events, he asserted to Dr. Kamenetz and Assistant Director Corsaro that he had a physician's approval for the therapeutic use of the RMS pool by employees Leak and Lloyd.[12] When he was unable to locate these forms, he produced new, backdated consultation sheets, had Nurse Durham sign Dr. Kenmore's name to them, and then presented them as the original consultation sheets. He did not explain to his superiors that these were replacements or that Nurse Durham had signed them. In fact, it appears from the record before us that Gipson never claimed to have had original consultation sheets for Lloyd and Leak until he testified to that effect in June 1980.

■ The MSPB could properly find that the backdating of replacement medical records and the attempt to pass off these replacements as original documents constituted falsification of medical records. *Cf.* 18 U.S.C. §§ 2071(b), 2073 (1976) (employee falsification of government records). The consultation sheets that Gipson produced

---

**10.** Corsaro's notes of his January 31 interview of Nurse Durham are entitled to even less weight than that afforded to hearsay testimony. The notes not only represent what was asserted by another person, but are also unverified by the author. While the notes were admissible in the MSPB proceedings, they were entitled to little probative value to the extent that they were in conflict with direct testimony presented before the Presiding Official. *See generally Hoska v. United States Dep't of Army*, 677 F.2d 131, 138–39 (D.C.Cir.1982).

**11.** Indeed, this is what we understand the MSPB to have done in deciding the case against petitioner. In his petition to the MSPB, Gipson argued that "nothing on the [consulta-

tion] sheets was 'false' except that they were back dated" and that "this was insufficient evidence to substantiate this charge [of falsification of medical records]." A.R. 244. The MSPB was therefore plainly apprised of Gipson's version of the events when it stated that "appellant admits the factual basis underlying the agency charges." *Gipson v. Veterans Admin.*, Docket No. DC075209249, slip op. at 4 (M.S.P.B. July 17, 1981); A.R. 262.

**12.** In fact, Gipson never received approval from Dr. Kenmore. According to Gipson's own testimony, Nurse Durham signed the consultation sheets for Leak and Lloyd in December, and Gipson never discussed their referral with Dr. Kenmore. Tr. II 29.

were knowingly false, with respect to both the date and the physician's signature, and Gipson used them in a willful attempt to deceive Dr. Kamenetz and Assistant Director Corsaro in order to protect himself. This demonstrated a disturbing lack of concern for medical records and a surprising lack of candor from a high-level hospital administrator.

### C. *Appropriateness of Gipson's Removal*

■ Gipson further argues that, even if the charges against him are sustained, the penalty of removal was unreasonable and inappropriate. A reviewing court's function in considering the appropriate sanction for employee misconduct, however, is limited.

> [Courts] will defer to the judgment of the agency as to the appropriate penalty for employee misconduct, unless its severity appears totally unwarranted in the light of such factors as the range of permissible punishment specified by statute or regulation, the disciplined party's job level and nature, his record of past performance, the connection between his job and the improper conduct charges, and the strength of the proof that the conduct occurred.

*Brewer v. United States Postal Service,* 647 F.2d 1093, 1098 (Ct.Cl.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982). We will not substitute our view of the appropriate sanction or displace the agency's judgment unless the sanction imposed is so clearly excessive as to constitute an abuse of the agency's discretion. *See Gueory v. Hampton,* 510 F.2d 1222, 1225 (D.C.Cir.1974); *Meehan v. Macy,* 392 F.2d 822, 830 (D.C.Cir.1968), *aff'd on rehearing,* 425 F.2d 472 (D.C.Cir.1969) (en banc).

■ We note first that Gipson's removal was within the range of penalties specified in the relevant agency regulations. *See* Veterans Administration Personnel Policy Manual, MP–5, Part I, Ch. 752, App. C (Aug. 2, 1971), *reprinted in* A.R. 109–13. The "Table of Examples of Offenses and Penalties" describes the appropriate penalties for Gipson's offenses as ranging from reprimand to removal.[13] In addition, the Manual notes that "[w]hen an employee has committed a combination or series of offenses, a greater penalty than is listed for a single offense is appropriate." A.R. 109.

Nor can we say that Gipson's removal was so clearly excessive as to constitute an abuse of discretion by the Veterans Administration. Gipson held an administrative position of considerable importance and responsibility. Among his duties were the promulgation and implementation of rules and regulations governing RMS. The Veterans Administration had a right to expect that the individual holding this position would abide by the hospital regulations, especially those for which he was primarily responsible. *Cf. Brewer v. United States Postal Service,* 647 F.2d 1093, 1098 (Ct.Cl. 1981) (Postal Service had right to expect a higher standard of conduct from Superintendent of Postal Operations), *cert. denied,* —— U.S. ——, 102 S.Ct. 1005, 71 L.Ed.2d 296 (1982). In addition, the falsification of government records is a serious offense in any context. *See, e.g., id.* (false entries on employee time cards); *Rotolo v. MSPB,* 636 F.2d 6 (1st Cir. 1980) (understatement of taxable income by IRS clerical employee); *Rodriguez v. Seamans,* 463 F.2d 837 (D.C. Cir.) (false answers to allegedly unconstitutional questions on employment forms), *cert. dismissed,* 409 U.S. 1094, 93 S.Ct. 704, 34 L.Ed.2d 678 (1972).[14] The knowing falsification of medical records in a hospital is certainly no less serious. The Veterans Administration could reasonably be concerned about the possible effect of falsified medi-

---

**13.** The Veterans Administration asserted that two offenses in this Table encompassed Gipson's conduct or were analogous to it: "26. Intentional falsification, misstatement, or concealment of material fact in connection with employment or any investigation, inquiry or other proper proceeding; or willfully forgoing [sic] or falsifying official Government records or documents;" and "27. Loss of, damage to, or unauthorized use of Government property, ... b. Through maliciousness or intent." A.R. 111. The recommended penalties for a first commission of either of these offenses range from a minimum of a reprimand to a maximum of removal. *Id.*

**14.** In each of these cases, the reviewing court upheld the employee's dismissal.

cal forms on patient care. The agency could also conclude that Gipson's falsification would have "a significant effect on his reputation for honesty and integrity and thereby a significant effect upon the efficiency of the" Service. *Yacovone v. Bolger*, 645 F.2d 1028, 1032 (D.C.Cir.), *cert. denied*, 454 U.S. 844, 102 S.Ct. 159, 70 L.Ed.2d 130 (1981); *see* 5 U.S.C. § 7513(a) (Supp. IV 1980). We therefore decline to set aside the judgment of the Veterans Administration, which the MSPB approved, that Gipson should be removed from his position based on the charges against him.[15]

**D. *Retaliatory Motives for the Agency Action***

■ Finally, Gipson claims that the action of the Veterans Administration was improperly motivated. He asserts that the charges and his subsequent removal were in retaliation for his efforts to assist Black hospital employees receive promotions and pay increases and for his disclosure of information and records to an Inspector General who was investigating property losses at the hospital. If either of these claims of prohibited personnel practices, 5 U.S.C. § 2302(b)(1), (8) (Supp. IV 1980), were proven, the MSPB could not lawfully sustain Gipson's removal, *id.* § 7701(c)(2)(B).

The Presiding Official "assign[ed] little credibility" to Gipson's assertion of a retaliatory motivation for his removal. She found his demeanor while testifying on this subject unconvincing, and Gipson presented no independent evidence in support of his allegations. The Presiding Official also noted that Gipson failed to establish a causal connection between his efforts on behalf of Black employees or his cooperation with the Inspector General and his removal. *Gipson v. Veterans Administration*, Docket No. DC075209249, slip op. at 2–3, 4 (M.S. P.B. Sept. 10, 1980); A.R. 236–37, 238. We

therefore find that the Presiding Official's decision, which was subsequently affirmed by the MSPB, was fully justified by the record.

### III. CONCLUSION

For the foregoing reasons, we decline to set aside the decision of the Merit Systems Protection Board. We conclude that the Presiding Official was not biased against Gipson, that the decision of the MSPB sustaining the charges of the Veterans Administration was supported by substantial evidence, that the penalty of removal was not inappropriate, and that the MSPB properly rejected Gipson's claim that the charges against him were in retaliation for protected activities. We therefore deny the petition for review and affirm the decision of the MSPB.

*So ordered.*

---

**15.** Gipson argues that the MSPB failed to consider all of the mitigating factors enumerated in *Douglas v. Veterans Admin.*, Docket No. AT075299006 (M.S.P.B. Apr. 10, 1981). Although the MSPB did not list each of the potentially mitigating factors from *Douglas* that was arguably relevant to Gipson's penalty, we do not believe that the MSPB thereby erred. The MSPB cited its ruling in *Douglas* in this case

and indicated that it had considered the potentially mitigating factors in accordance with that opinion. *Gipson v. Veterans Admin.*, Docket No. DC075209249, slip op. at 4–5 (M.S.P.B. July 17, 1981); A.R. 262–63. Thus, the MSPB adequately disclosed its reasoning process and did not "cross[] the line from the tolerably terse to the intolerably mute." *WAIT Radio v. FCC*, 418 F.2d 1153, 1157 (D.C.Cir.1969).