**John J.M. OBREMSKI, Petitioner,**

v.

**OFFICE OF PERSONNEL MANAGEMENT AND MERIT SYSTEMS PROTECTION BOARD, Respondent.**

No. 82–1440.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 24, 1982.

Decided Feb. 11, 1983.

John J.M. Obremski, pro se.

Regina C. McGranery, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth, R. Craig Lawrence and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on the brief, for respondent. Evangeline Swift, Atty., Merit Systems Protection Bd., Washington, D.C., also entered an appearance for respondent.

Before MacKINNON, MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by HARRY T. EDWARDS, Circuit Judge.

HARRY T. EDWARDS, Circuit Judge:

In this case we are asked to review a decision of the Merit Systems Protection Board ("MSPB" or "Board") upholding a determination by the Office of Personnel Management ("OPM") that petitioner, John J.M. Obremski, is not a "law enforcement officer" within the meaning of 5 U.S.C. § 8331(20) (1976 & Supp. V 1981), and therefore does not qualify for special retirement benefits provided by 5 U.S.C. § 8336(c)(1) (Supp. V 1981). The sole issue is whether petitioner's duties as Corporate Quality Assurance Manager for Federal

Prison Industries ("FPI") require him to have "frequent ... direct contact" with federal prisoners. 5 U.S.C. § 8331(20). Because we believe that the MSPB has sustained a determination by the OPM that misconstrues and misapplies section 8331(20), we reverse.

## I. BACKGROUND

### A. *Petitioner's Position with FPI*

FPI is a government corporation that provides current employment and job training to inmates of the federal prisons through a network of factories within the prison system.[1] In November 1977, FPI hired petitioner as a Corporate Quality Assurance Manager. Petitioner was twenty-seven years old when he took the job, and had no prior experience working for the federal prison system. The formal Vacancy Announcement to which petitioner responded, and on which he represents that he relied, described the job as a "law enforcement officer" position.[2] Furthermore, the official Position Description for the Corporate Quality Assurance Manager job specifically stated that "[t]he incumbent's duties require frequent trips to the correctional institutions within the Federal Prison System, during which direct contact with in-

mates is common."[3] This "frequent direct contact" with prisoners is a key determinant of "law enforcement officer" status for FPI employees under section 8331(20).

On the record, it appears quite clear that petitioner's actual work experiences in the Corporate Quality Assurance Manager position bear out FPI's job description. The Government disputes neither petitioner's assertion that he spends thirty-percent of his time visiting FPI factories located within correctional institutions, nor petitioner's account of what he does on these trips:

> I spend all my time in the factory with the inmates who are manufacturing FPI goods. I am primarily concerned with the Quality Assurance Program and the inmate Quality Assurance Assistants who perform various tasks such as contract review, receiving inspection, in-process inspection, final inspection, testing, blueprint reading, etc. There are approximately 400 inmate Quality Assurance Assistants in the system. I work along with these inmates to verify they have had proper instruction and are knowledgeable in such areas as statistical sampling plans, calibration, classification of defects and life cycle testing. This action is accomplished by accompanying these inmates during their normal work day and

1. FPI is a "government corporation of the District of Columbia, ... [and is] administered by a board of six directors, appointed by the President ...." 18 U.S.C. § 4121 (1976). FPI, like the Bureau of Prisons, is a unit within the Department of Justice.

2. The Vacancy Announcement states that, "[i]n accordance with Public Law 93–350, applicants outside the Federal Prison Service will not be considered if they have reached their 35th birthday." Nationwide Vacancy Announcement, Federal Prison Service (Aug. 19, 1977), *reprinted in* Brief for Petitioner, Appendix ("App.") 21. The statutory provision referenced in this Announcement, codified at 5 U.S.C. § 3307(d) (Supp. V 1981), creates an exemption to the Age Discrimination in Employment Act, 29 U.S.C. § 633a (1976 & Supp. V 1981). *See Stewart v. Smith,* 673 F.2d 485, 492 (D.C.Cir.1982). Section 3307(d) by its terms applies to "law enforcement officer [positions] ..., as defined by section 8331(20) ...," and the age discrimination exemption has been held to be valid only if an agency "proper-

ly designate[s] the relevant employees as law enforcement officers." *Stewart v. Smith,* 673 F.2d at 494. Thus, when FPI formally described the job as exempt under section 3307(d), it necessarily advertised the position as a "law enforcement officer" position.

Petitioner represents that, at the time he took the job with FPI, "[s]ince [he] was currently employed [outside the Federal Prison Service] ..., and [was] 27 years old ..., [he] believed [his] position was covered under Public Law 93–350." Brief for Petitioner 6.

3. *See* Position Description, Federal Prison Industries, Inc., "Corporate Quality Assurance Manager (Industrial Manager)," June 13, 1979, *reprinted in* App. 16, 18. *See also* Evaluation Statement, June 13, 1979, *reprinted in* App. 52, 53 ("Incumbent must ... make frequent trips to institutions for training, employment and counseling with inmates auditing the various programs at the factories for compliance with contractor and vendor specifications.").

by asking questions and observing their actions.[4]

### B. *Petitioner's Attempts to Obtain an Administrative Determination of His Status as a "Law Enforcement Officer"*

Petitioner's problems apparently commenced when he realized that, although his job was described as a "law enforcement officer" position, the amounts being contributed for his retirement fund were insufficient to afford him the special benefits conferred by 5 U.S.C. § 8336(c)(1). In order to cure this problem, petitioner found that he would need further formal declarations regarding his job status. Unfortunately, although petitioner was already *performing* as a "law enforcement officer" pursuant to a written job description, he faced a bureaucratic stonewall when he sought confirmation of his status.

In October 1979, petitioner began an unsuccessful series of attempts to obtain a dispositive determination that he is a "law enforcement officer" eligible for special retirement benefits under 5 U.S.C. § 8336(c)(1). Petitioner first sought a determination from his immediate supervisor at FPI, Associate Commissioner Gerald Farkas, who referred the request to FPI's personnel office. Although Farkas subsequently responded positively to the petitioner's request, for a time neither he nor the FPI personnel office acted to make an official determination.

When he was initially unable to obtain anything more than the Vacancy Announcement and the Position Description from FPI, petitioner went directly to the OPM on January 11, 1980, seeking concurrence in his own "findings" that he is a "law enforcement officer." The OPM refused to give its concurrence.[5] Though the rationale for this decision is far from clear, the determination

that petitioner is not a "law enforcement officer" appears to have been based principally on a 1975 letter of agreement between the Department of Justice and the Civil Service Commission that set joint policy on the status of employees of the Bureau of Prisons (but not FPI) under section 8336(c).[6] The letter of agreement established two categories of employees for this purpose: first, all employees stationed inside prisons, and, second, all employees in administrative jobs with the Central or Regional office. The agreement gave blanket "law enforcement officer" coverage to employees in the first category on the presumption that such employees have "frequent direct contact" with inmates (primary coverage), and to all employees in the second category who transferred without break-in-service from a job station within a prison (secondary coverage). For any employee hired directly into an administrative position from a job outside the prison system, the letter of agreement provided that, depending on the nature of the position, the Justice Department would, on a case-by-case basis, seek concurrence from the OPM on whether the particular employee met the "frequent direct contact" test and thus qualified for primary coverage. These latter cases, the letter of agreement pointed out, would be rare. Based on the policy established by this agreement, the OPM, noting that petitioner is an administrative employee, rejected petitioner's claim for coverage because he did not transfer from a prison-based job, and because he spends the "major part" of his time at the Central Office and therefore fails the "frequent direct contact" test.

Petitioner sought clarification of the OPM's decision on April 10, 1980. He pointed out that he is not an employee of the Bureau of Prisons, but rather of FPI. He also posed several specific questions to the OPM, including queries about the OPM's

---

4. Reply Brief for Petitioner 1–2.

5. *See* Letter from Gerald N. Hoisington, Special Inquiries, to John J.M. Obremski (April 3, 1980), *reprinted in* App. 22 [hereinafter cited as OPM Decision I].

6. *See* Letter from Robert S. Smith, Director of Personnel, Department of Justice, to Thomas A. Tinsley, Director, Bureau of Retirement, Insurance, and Occupational Health, U.S. Civil Service Commission (Jan. 10, 1975), *reprinted in* App. 36. The OPM is the organizational successor to the Civil Service Commission on retirement and pension matters.

specific definition of "frequent direct contact," the individuals at FPI who may be "appropriate administrative authorit[ies]" for purposes of 5 U.S.C. § 8331(20),[7] and the effect of the Job Vacancy Announcement advertising his job as a "law enforcement officer" position. The OPM issued a clarifying ruling on May 7, 1980, again denying petitioner's request for a determination of eligibility under section 8336(c)(1): [8]

> We have defined the term "frequent direct contact" as an employee who is *primarily* in direct contact with individuals in their detention, direction, supervision, inspection, training, care, transportation or rehabilitation. Accordingly, all employees working inside the prison walls with the Bureau of Prisons and the Federal Prison Industries, Inc., are considered as covered under section 8336(c)(1). Such employees working in penal and correctional institutions are constantly, [sic] interviewing, counseling, instructing and supervising the work of prisoners. This is in contrast with the employee who works in the central office whose duties require only occasional visits to the penal or correctional institutions. Therefore, the rights of these employees, such as yourself, will be determned [sic] on an individual basis and governed by the facts and circumstances in each particular case.

Petitioner argued that he satisfies the "frequent direct contact" test since his visits to prisons would total six years over the course of a twenty-year career. The OPM rejected this contention, explaining that "[i]f you had been able to show that for a sufficient period of time while employed with the Federal Prison Industrits, [sic] Inc., rather than for your entire career, you met the 'frequent and direct contact' requirement with prisoners, your subsequent service would be creditable under section 8336(c)(1) in the administrative category"; but "your service [is] not creditable . . . since the major part of your time [is] spent in the Central Office in Washington, D.C." [9] In response to petitioner's question about who at FPI is an "appropriate administrative authority," the OPM noted that one or more of several FPI officials may "make . . . a recommendation" of eligibility.[10] Finally, addressing the Vacancy Announcement, the OPM cited the 1975 letter of agreement as controlling on OPM's view of petitioner's job status despite the Announcement, and referred petitioner to FPI's personnel office for FPI's view of the effect of the Announcement.

Unsatisfied, petitioner sought formal reconsideration of the OPM's decision on June 6, 1980. This time petitioner submitted a letter from Associate Commissioner Farkas certifying that petitioner spends thirty-percent of his time visiting prison factories and therefore meets the "frequent direct contact" test.[11] Nevertheless, on August 12, 1980, the OPM affirmed its earlier determinations,[12] essentially summarizing the reasoning used in the first two decisions. It first explained that " 'frequent direct contact' [means] an employee who is *primarily* in direct contact with individuals in their detention, direction, supervision, inspection, training, care, transportation or rehabilitation." [13] Applying that test to the facts of petitioner's case, the OPM again ruled peti-

---

7. Section 8331(20) provides that the determination whether an employee meets the "frequent direct contact" test shall be made by "the appropriate administrative authority with the concurrence of the [OPM]." *See* Part II.B.2. *infra.*

8. *See* Letter from Baker Moy, Special Inquiries, to John J.M. Obremski (May 7, 1980), *reprinted in* App. 26, 27 [hereinafter cited as OPM Decision II].

9. *Id.*

10. *Id.* at 26.

11. *See* Letter from Gerald M. Farkas, Associate Commissioner, FPI, to OPM, Bureau of Insurance, Retirement, and Occupational Health (June 6, 1980), *reprinted in* App. 29.

12. *See* Letter from Michael J. Barrett, Chief, Reconsideration Staff, Compensation Group, OPM, to John J.M. Obremski (Aug. 12, 1980), *reprinted in* App. 33 [hereinafter cited as OPM Decision III].

13. *Id.*

tioner ineligible for credit as a "law enforcement officer." He did not "transfer[ ] ... from a covered position at a penal institution," nor did he meet the "frequent direct contact" test "[s]ince only approximately 30% of [his] worktime [w]as spent on field visits." [14] Thus, the decision concluded, in view of the time petitioner spends in the field and of the OPM's agreement with the Justice Department, petitioner's service as a "Quality Assurance Specialist, Federal Prison Industries, Inc. . . . with the Bureau of Prisons" is not creditable under 5 U.S.C. § 8336(c)(1).[15]

## C. *Proceedings Before the MSPB*

Petitioner appealed to the MSPB, asking the Board to determine that he qualifies as a "law enforcement officer" under 5 U.S.C. § 8336(c)(1). Acknowledging that FPI's job description includes within petitioner's duties "frequent trips to correctional institutions during which direct contact with inmates is common," [16] that Associate Commissioner Farkas certified to the OPM petitioner's "frequent direct contact" with inmates,[17] and that at the Board's hearing petitioner presented evidence tending to support such contact, the presiding official nonetheless upheld the OPM's refusal to concur. Since the dictionary defines "frequent" as "constant, habitual or regular," the presiding official explained, "the [OPM's] denial of concurrence does not seem to be arbitrarily made." [18] She made this finding, citing deference to a "reasonable" administrative interpretation of the statute, despite the fact that the OPM actually interpreted "frequent" to mean "primarily." *See* note 21 *infra.*

14. *Id.* at 34–35.

15. *Id.* at 35.

16. *Obremski v. OPM,* Dec. No. DC08318010330 (Dec. 4, 1980), *reprinted in* App. 60 [hereinafter cited as Initial MSPB Decision]; *see* note 3 *supra.*

17. Initial MSPB Decision, App. 60; *see* note 11 *supra.*

18. Initial MSPB Decision, App. 61.

The full Board sustained the presiding official's decision,[19] relying entirely on deference to an agency's interpretation of a statute under its administrative jurisdiction. The presiding official correctly upheld the OPM's determination, the MSPB ruled, because the "administrative construction given statutes by an agency charged with its [sic] administration should be followed unless there are compelling indications that it is wrong." [20] Here, the Board explained, there are no such compelling indications, and "[t]he administrative interpretation of the word frequent to mean constant, habitual, or regular is reasonable and consistent with its literal meaning." [21]

This petition for review followed.

## II. DISCUSSION

### A. *Scope of Review*

■ "The standards for judicial review of MSPB decisions are familiar ones." *Gipson v. Veterans Administration,* 682 F.2d 1004, 1008 (D.C.Cir.1982). "[W]e are required to 'review the record and hold unlawful and set aside any agency action, findings, or conclusions found to be—(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence . . . .' " *Id.* (quoting 5 U.S.C. § 7703(c) (Supp. IV 1980)). These statutory standards, drawn from the Administrative Procedure Act, accord with settled principles of administrative law. We thus have no quarrel with the Government's admonition that MSPB decisions generally deserve deference.

19. *Obremski v. OPM,* Dec. No. DC08318010336 (Mar. 24, 1982), *reprinted in* App. 122 [hereinafter cited as MSPB Decision].

20. MSPB Decision, App. 126.

21. *Id.* The administrative interpretation by the OPM was actually that "frequent" means "primarily." *See* OPM Decisions II, III, App. 26, 33. The presiding official sustained this interpretation as consistent with the dictionary formulation, "constant, habitual or regular." *See* text accompanying note 18 *supra.*

The issue under review, however, is one of interpretation and application of a statutory term to settled facts. Under the Administrative Procedure Act "the reviewing court shall decide all relevant questions of law, [and] interpret constitutional and statutory provisions . . . ." 5 U.S.C. § 706 (1976). Thus, where statutory terms "are not defined by the statute and their exact meaning is in dispute[,] . . . the courts . . . ultimately determine as a matter of law what they include." *FTC v. Gratz*, 253 U.S. 421, 427, 40 S.Ct. 572, 574, 64 L.Ed. 993 (1920). Of course, we recognize the equally well established rule that in reviewing an agency's application of statutory terms with which it has administrative charge "[t]he judicial role is narrow." *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978). But this limited judicial role assumes an adequately articulated administrative decision interpreting the relevant statutory law within a range of reasonableness. *See Federal Election Campaign Commission v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) ("the thoroughness, validity, and consistency of an agency's reasoning are factors that bear on the amount of deference to be given an agency's ruling"). The judicial role is not so limited where, as here, the agency interpretation under review is poorly reasoned and eminently out of accord with applicable law.[22] Unlike the MSPB in this case, we are thus unwilling

> simply [to] abdicate [our] responsibility by mumbling an indiscriminate litany of cases that extends "great deference to administrative conclusions." There is

more to the judicial role. "Reviewing courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."

*Hi-Craft Clothing Co. v. NLRB*, 660 F.2d 910, 914 (9th Cir.1981) (quoting *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)).

As we explain below, the OPM interpreted 5 U.S.C. § 8331(20) in a manner that is plainly at odds with the statute's meaning. And it did so conclusorily, without giving *any* consideration to the contrary view of FPI. This at once vitiates whatever deference would otherwise be due the administrative interpretation of the statute and requires us to reverse the MSPB's decision sustaining the OPM's determination.

B. *The "Law Enforcement Officer" Definition in 5 U.S.C. § 8331(20)*

Section 8331(20) of title 5, United States Code, provides, in part,

> "law enforcement officer" means an employee, *the duties of whose position are primarily the* investigation, apprehension, or *detention* of individuals suspected or convicted of offenses against the criminal laws of the United States, including an employee engaged in this activity who is transferred to a supervisory or administrative position. *For the purpose of this paragraph, "detention" includes the duties of—*

---

**22.** Two other factors militate against deference to the OPM's interpretation of the statute in this case. First, under 5 U.S.C. § 8331(20), Congress gave the principal role in interpreting the statutory term at issue to "the appropriate administrative authority," and left for the OPM the role of approving or disapproving that authority's determination. This implies a secondary decisionmaking role for the OPM, *see* Part II.B.2. *infra*, and, as a result, diminishes the weight that should be granted the OPM's construction of the statute. *Cf. GAO v. GAO Personnel Appeals Board*, 698 F.2d 516 at 528 n. 63 (D.C.Cir.1983) (refusing to defer to GAO's construction of statute granting both GAO and

GAO Personnel Appeals Board implementation authority, since Appeals Board given sole discretion to implement the particular provision at issue). Second, the OPM was not acting here in a broad policymaking or rulemaking mode. Although the OPM has rulemaking powers on many other matters, in this instance it was not acting in the role of an agency to which great deference is usually accorded. *Cf. Federal Election Campaign Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 44, 70 L.Ed.2d 23 (1981) ("deference should presumptively be afforded" to agency authorized to make rules and formulate broad policy in administering statute).

(A) *employees of the* Bureau of Prisons and *Federal Prison Industries, Incorporated;*

(B) employees of the Public Health Service assigned to the field service of the Bureau of Prisons or of the Federal Prison Industries, Incorporated;

(C) employees in the field service at Army or Navy disciplinary barracks or at confinement and rehabilitation facilities operated by any of the armed forces; and

(D) employees in the Department of Corrections of the District of Columbia, its industries and utilities;

*whose duties in connection with individuals in detention* suspected or convicted of offenses against the criminal laws of the United States or of the District of Columbia or offenses against the punitive articles of the Uniform Code of Military Justice (chapter 47 of title 10) *require frequent (as determined by the appropriate administrative authority with the concurrence of the [OPM]) direct contact with these individuals in their detention,* direction, supervision, inspection, training employment, care, transportation, or rehabilitation; [23]

Proper interpretation of this somewhat inartfully drawn provision requires careful parsing. First, because petitioner is an employee working with the "Federal Prison Industries, Incorporated" (as opposed to a guard or an official stationed at a prison),

we must determine whether his "duties in connection with [detained] individuals ... require frequent ... direct contact with these individuals." Second, we must determine whether the overall duties of petitioner's job "primarily" involve detention (as distinguished from "frequent ... direct contact" with prisoners in detention).[24] Following this approach, which gives full meaning to all relevant portions of the statute, there can be no doubt but that petitioner's job meets the specification of "law enforcement officer."

The statute defines "detention" to include the *"duties"* of any FPI employee, if those duties "in connection with [detained] individuals ... require frequent ... direct contact with [such] individuals." Petitioner's job description and his work routine make clear that all of his job duties relate to supervision of work performed by inmates; he cannot carry out the duties of that position without visiting prisons regularly. Thus, if petitioner's duties as Quality Assurance Manager require prison trips that are sufficiently regular and that involve sufficiently close dealings with inmates as to satisfy the "frequent direct contact" test, *all* of petitioner's duties as Quality Assurance Manager constitute "detention." Since petitioner's sole duties with FPI are as Quality Assurance Manager, there can be no question that—if the duties of the position constitute "detention"—petitioner's duties "primarily" involve deten-

---

**23.** (Emphasis added).

**24.** Our interpretation of the statute maintains a distinction between the term "primarily" in the initial portion of section 8331(20), and the term "frequent" in the special definition of "detention" found at the conclusion of the subsections to section 8331(20). Rather than read the term "frequent" out of the statute—as the OPM did, *see* Part II.B.1. *infra*—we adopt an approach that attributes meaning to all of the relevant statutory language. We thus strictly separate the questions whether petitioner engages in "detention" (which requires a construction of the term "frequent"), and whether petitioner's "duties are primarily ... detention."

We read the "primarily detention" language to limit the "law enforcement officer" category to employees whose primary duties are *func-*

*tionally related* to their "frequent direct contact" with inmates. To illustrate: if petitioner spent 70% of his time with FPI performing duties as a financial analyst that were wholly unrelated to his prison visits, and only 30% of his time doing Quality Assurance work, he would not be "primarily" engaged in "detention." In essence, this includes within the definition of "detention" a range of duties—whether purely administrative work or entirely field work—that functionally relate to "frequent direct contact" with prisoners. We believe the language of the statute supports our interpretation. "Detention" is defined to include all duties *"in connection with* [detained] individuals" that require "frequent direct contact," and is not limited to duties that actually involve such contact.

tion.[25] The whole analysis of petitioner's "law enforcement officer" status thus comes down to the "frequent direct contact" test.

### 1. The OPM's Erroneous Definition of "Frequent"

The most glaring error in this case is the OPM's misconstruction of the term "frequent." The definition of "frequent" ultimately adopted by the OPM is that " 'frequent direct contact' [only includes] an employee who is *primarily* in direct contact" with inmates.[26] Whatever else may be said about the meaning of section 8331(20), one thing that is clear is that the reference to "frequent" does *not* mean "primarily." As one congressional commentator attempted to explain to the OPM in correspondence on petitioner's case, "if the Congress had intended ... 'primar[ily]' ..., the Congress would have used that term when defining 'detention' as it did in the basic definition of 'law enforcement officer'." [27] To read the two terms as synonymous renders the word "frequent" superfluous and collapses the statute into confusing circularity.

It seems that the OPM adopted this definition to assign some quantifiable meaning to what is inherently a relative term. Thus, the OPM was able to tell petitioner that he does not come within the statute because he spends the "major part" of his time at the Central Office.[28] And more recently the OPM was able to report to the Chair of the House Subcommittee on Compensation and Employee Benefits that " 'frequent direct contact' ... describ[es] the duties of an employee who is *primarily* (at least 51% of the time) in direct contact" with inmates.[29]

The meaning of "frequent," however, is heavily dependent on the factual context. The term cannot be defined in any meaningful way by looking to dictionary definitions or by assigning a cut-off number to all cases. Any attempt to define the term without intimate knowledge of the particular employee's duties and the duties of others in comparable jobs must inevitably be arbitrary. That is precisely why Congress assigned the principal role in determining "frequent direct contact" to the "appropriate administrative authority," with the OPM left only to approve or disapprove an initial determination of coverage.[30]

### 2. The OPM's Failure to Consider FPI's View of Petitioner's "Law Enforcement Officer" Status

Section 8331(20) provides that the determination of "frequent direct contact" is to be made by "the appropriate administrative authority with the concurrence of the [OPM]." "Appropriate administrative authority" refers to the employing agency,[31]

---

**25.** *See* note 24 *supra.*

**26.** *See* OPM Decisions II, III, App. 26, 33.

**27.** Letter from Morris K. Udall, Acting Chairman, House Committee on Post Office and Civil Service, to Hon. Jule M. Sugarman, Acting Director, OPM (Jan. 15, 1981), *reprinted in* App. 87, 88. Petitioner, a non-lawyer arguing *pro se,* urged at oral argument that we accept Representative Udall's letter as conclusive evidence of "congressional intent." We find petitioner's earnestness inspiring, but of course cannot accept the letter as anything other than a concise statement of the difficulty with the OPM's construction of the statute. Would that the general problem of discovering Congress' intent, with which we so often struggle, were solvable simply by writing the Representative of our choice.

**28.** *See* OPM Decisions I & II.

**29.** Letter from Donald Devine, Director, OPM, to Hon. Mary Rose Oakar, Chair, House Subcommittee on Compensation and Employee Benefits, Committee on Post Office and Civil Service (May 20, 1982), *reprinted in* App. 135.

**30.** *See* Part II.B.2. *infra.*

**31.** This, of course, is the most natural reading of the language. But support for it can be found in the statute's legislative history as well. The definition of "law enforcement officer" in 5 U.S.C. § 8331(20), added by amendment in 1974, *see* Pub.L. No. 93–350, 88 Stat. 355, takes its language from a version of 5 U.S.C. § 8336(c) that was also amended in 1974, *see id.* Prior to these amendments, section 8336(c) provided early retirement benefits upon case-by-case application; an employee's application would be granted "if the head of *his department or agency* recommend[ed] his retirement and the Commission approv[ed] that recom-

or, as the OPM has recognized, an "official[ ] of [a] major division[ ]" of that agency delegated authority to make the determination.[32] The phrasing of the statute—"frequent ... as *determined* by the appropriate administrative authority with the *concurrence* of the [OPM]"—clearly suggests that the employing agency determines coverage under section 8331(20) in the first instance, and that the OPM's role is limited to approving the initial determination.

We think this ordering of decisionmaking roles requires that the determination of the employing agency be given a fair degree of deference by the OPM, since that agency and its officials are likely to be the most familiar with the nature of a particular employee's job. The employing agency, moreover, has the greatest interest in and should have the greatest control over structuring the jobs within its own workforce.[33] The OPM remains free to withhold its concurrence if the employing agency's determination is demonstrably incorrect or adversely affects administration of the early retirement system as a whole, but any such refusal must be soundly justified, adequately

articulated, and based upon a proper construction of section 8331(20).

■ Because the OPM totally failed to consider the unrefuted evidence supporting FPI's view that petitioner has "frequent direct contact" with prisoners, its refusal to concur in this case was wholly arbitrary and cannot stand. All of the evidence shows that FPI took the view that petitioner's job falls within the scope of section 8336(c)(1). The Vacancy Announcement advertised the job as a "law enforcement officer" position.[34] FPI's official job description indicates that petitioner must "frequently" travel to prisons and that on such trips he has "direct contact" with prisoners.[35] And Associate Commissioner Farkas, petitioner's supervisor at FPI, certified to the OPM that petitioner has "frequent direct contact" with prisoners.[36] Particularly given the absence of any contrary indications, these factors unmistakably demonstrate that FPI's consistent official view was that petitioner has "frequent direct contact" with prisoners.

The OPM ignored this evidence. Its decision never mentioned Associate Commissioner Farkas' letter certifying that peti-

---

mendation." 5 U.S.C. § 8336(c) (1970) (amended 1974) (emphasis added). *See* H.R. Rep. No. 463, 93rd Cong., 1st Sess. 2 (1974) (under pre-1974 law "[r]etirement [was] contingent upon the *employing agency's* recommendation and the Civil Service Commission's approval") (emphasis added) [hereinafter cited as H.R.Rep. No. 463].

In this connection, we note the House Report erroneously stated that prior to the 1974 amendments the employing agency and the Civil Service Commission were to assess an applicant's eligibility for early retirement benefits in light of the degree of hazard that his job involved. *See* H.R.Rep. No. 463 at 2. Relying on this erroneous report, the Government argues—abandoning the OPM's rationale—that petitioner "seeks ... to obtain the special benefits accorded those whose work involves the constant threat of hazards," even though he spends only a "small fraction" of his time behind prison walls. Brief for the Government 10. The argument is wide of the mark. The 1974 amendments made clear that the degree of hazard to which an employee is exposed is irrelevant to his "law enforcement officer" status. *See* 119 CONG.REC. 30,596 (1973) (statement of Rep. Daniels) (correcting printer's er-

ror in H.R.Rep. No. 463; "[l]et the record properly show that the committee does not—I repeat—does not accede to the concept that the more generous privileges provided by existing law or those proposed by this bill are extended as a reward to an employee for his having performed hazardous duties").

32. Federal Personnel Manual Supp. 831–1, subch. S9–3, ¶ c(3).

33. *Cf. Stewart v. Smith,* 673 F.2d at 493 (In enacting Pub.L. No. 93–350, "Congress[ ] ... unequivocal[ly] inten[ded] to provide agencies with authority to structure their hiring practices so as to implement [the statute's early] retirement scheme for law enforcement officers ... [and to] give agencies the flexibility to use maximum age entry rules in order to achieve the statute's overall objective of securing a 'young and vigorous' law enforcement workforce.") (footnote omitted).

34. *See* note 2 and accompanying text *supra.*

35. *See* note 3 and accompanying text *supra.*

36. *See* note 11 and accompanying text *supra.*

tioner has "frequent direct contacts," apparently treating that letter as a "recommendation" carrying no weight as against the OPM's contrary view.[37] The OPM also wholly failed to address the official documentation indicating that FPI viewed petitioner's job as a covered "law enforcement officer" position. In response to petitioner's question about the Job Vacancy Announcement, the OPM essentially took the position that, whatever the view of the FPI's personnel office, established OPM policy on "law enforcement officer" status for Bureau of Prison employees supersedes the Announcement.[38] And despite OPM regulations making clear that job descriptions are crucial evidence to any determination of "law enforcement officer" status,[39] the OPM never once mentioned the language in FPI's job description tracking virtually verbatim the "frequent direct contact" phrase in section 8331(20). Although we fail to see how there could have been any uncertainty in this case, if OPM officials were somehow unsure of FPI's view of petitioner's job, an inquiry could have been

made of FPI officials.[40] Such an inquiry was never made; rather, the OPM simply ignored the determination of the "appropriate administrative authority" and openly disregarded the critical, undisputed facts concerning the petitioner's job. As demonstrated above, officials at the OPM were apparently blinded by their own blatant misconstruction of section 8331(20).

Were the facts here disputed, we might be inclined to remand for further consideration by the OPM. But there is no factual dispute, and the OPM—after thrice considering the case—has repeatedly applied, in the most conclusory fashion, an incorrect interpretation of the controlling statutory term.[41] Accordingly, we hold that, as clearly set forth in FPI's official documentation on petitioner's position, petitioner has "frequent direct contact" with federal prisoners, and is therefore entitled to credit for special retirement benefits.

### III. CONCLUSION

For the foregoing reasons, we conclude that the OPM erred as a matter of law in

---

**37.** *See* note 10 and accompanying text *supra;* OPM Decision III, App. 34. Section 8331(20) does not use the term "recommendation," as its predecessor statute did. *See* note 31 *supra.*

**38.** *See* text accompanying note 10 *supra.* In correspondence relating to petitioner's case, the OPM noted that an official of the Bureau of Prisons had explained the Vacancy Announcement's reference to Pub.L. No. 93–350 as a mistake. *See* Letter from Michael J. Barrett, Chief, Reconsideration Staff, Compensation Group, to Hon. Herbert E. Harris III, United States House of Representatives, (Aug. 12, 1980), *reprinted in* App. 30, 32. In deciding petitioner's case, however, the OPM did not take the position that the Announcement's Reference to Pub.L. No. 93–350 was an error. And neither the MSPB below nor the Government here has suggested this possibility. In any event, petitioner is employed by FPI, not the Bureau of Prisons, *see* note 40 *infra,* and *FPI* never suggested that the reference was mistaken.

**39.** Federal Personnel Manual Supp. 831–1, subch. S9–3, ¶ c(4) ("For purposes of [the OPM's] concurrence, *a position description* (together with any other documentary evidence) must be submitted by the "appropriate administrative authority . . . .") (emphasis added).

**40.** We notice that in other cases when a job description has given insufficient information

of whether a position involves "frequent direct contact," the OPM has sought additional information from the employing agency. *See Stewart v. Smith,* 673 F.2d at 494–95.

**41.** Each of the OPM's decisions relies on the 1975 Justice Department letter of agreement governing "law enforcement officer" policy for Bureau of Prisons employees. *See* text accompanying notes 6–7 *supra.* But nothing in the letter of agreement itself, or in any regulations governing the Bureau of Prisons or FPI, indicates that personnel policies applicable to employees of the Bureau are necessarily applicable to employees of FPI. More importantly, however, even if the letter of agreement was somehow applicable, it is not by its terms dispositive of petitioner's status. The letter says nothing about excluding from the "law enforcement officer" category administrative employees who spend the "major part" of their time in the Central Office; and the agreement's suggestion that administrative employees who do not qualify for secondary coverage will only "rarely" qualify for primary coverage under the "frequent direct contact" test—made in the context of the Bureau of Prisons' policy of hiring persons without field experience only in exceptional cases—says nothing about the substantive content of that test.

determining that petitioner is not a "law enforcement officer" within the meaning of 5 U.S.C. § 8331(20). We accordingly reverse the MSPB's affirmance of that determination. We instruct the MSPB to enter an appropriate order declaring petitioner to be eligible for early retirement benefits under 5 U.S.C. § 8336(c)(1) based on the complete term of his service with FPI, *i.e.,* retroactive to the date when petitioner commenced working at FPI. The MSPB shall, in implementing this decision, afford petitioner whatever particularized relief may be necessary and appropriate to give full effect to the judgment here rendered.[42]

*So Ordered*

---

42. If, in order to make the petitioner whole, it is necessary to deduct sums from his salary for contributions to his retirement fund to make up for *past* service, this shall be done in such a way as to avoid penalizing the petitioner. The MSPB shall, therefore, adopt some remedial plan to allow the petitioner to make contributions for past service over some reasonable time period in the future (with such time period being at least equal to the petitioner's current length of service on the job).