NORTHERN COLORADO WATER CON-
SERVANCY DISTRICT, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Energenics Systems, Inc.,
Intervenor.

No. 82–1576.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 20, 1983.

Decided March 27, 1984.

Thomas P. Humphrey, Washington, D.C., for petitioner. Jeffrey H. Howard, Washington, D.C., entered an appearance for petitioner.

Joseph Davies, Atty., F.E.R.C., Washington, D.C., for respondent. Charles A. Moore, Gen. Counsel, Barbara J. Weller, Deputy Sol., and Joshua Z. Rokach and Thajauna D. Miller, Attys., F.E.R.C., Washington, D.C., were on the brief for respondent.

Andrea Hill, Washington, D.C., was on the brief for intervenor.

Before WRIGHT and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.

Concurring opinion filed by Senior Circuit Judge MacKINNON.

J. SKELLY WRIGHT, Circuit Judge.

This case involves the unsuccessful efforts of the Northern Colorado Water Conservancy District (NCWCD), a political subdivision of the State of Colorado, to reopen a preliminary permit proceeding of the Federal Energy Regulatory Commission (FERC or Commission).[1] On August 7, 1981 FERC issued to a private developer, Energenics Systems, Inc., a preliminary permit to study the feasibility of and to prepare a license application for construction and operation of a hydroelectric power project on the St. Vrain Canal in Boulder County, Colorado. NCWCD, which had not participated in the proceeding, has responsiblity under Colorado law for operating and maintaining a number of water distribution facilities that provide water to the cities, towns, and agricultural irrigation interests of northeastern Colorado. The St. Vrain Canal is one of those facilities. On December 10, 1981 NCWCD petitioned FERC to reopen the proceeding, reconsider its award of the permit to Energenics, and allow NCWCD to compete for the permit.

The bases of NCWCD's petition were NCWCD's contentions that FERC had sent it no written notice of Energenics' permit application and that Section 4(f) of the Federal Power Act, 16 U.S.C. § 797(f) (1982), gave it a statutory right to such a written notice. NCWCD contended that, because no notice had been sent, FERC was required to reopen the permit proceeding even though the petition for reopening was filed over four months after the award of the permit and 72 days after NCWCD had learned of the permit.

FERC, without holding a hearing, rejected the petition as untimely. In a very brief and conclusory opinion FERC held that NCWCD had had sufficient "actual notice" to make the lateness of the petition unjustified. Because we hold that the facts, as alleged by NCWCD, show that the lateness of the petition for reconsideration was probably justified, we reverse FERC's rejection of NCWCD's petition. Our decision is based on both the clear language and the clear legislative history of Section 4(f) of the Federal Power Act.[2] FERC's failure to give written notice to NCWCD was an indisputable violation of that provision. While NCWCD's subsequent behavior was not exemplary, both its failure to quickly learn of the proceeding and its failure to quickly ascertain and act on its interests were reasonably foreseeable results of FERC's statutory violation. Indeed, the Congress that passed the written notice provision of Section 4(f) did so because it fully expected that public entities like NCWCD, if not given direct written notice, would frequently behave as NCWCD

---

1. Prior to the creation of FERC, see Pub.L. 95–91, Title IV, § 401, Aug. 4, 1977, 91 Stat. 582 (codified at 42 U.S.C. § 7171 (Supp. V 1981)), the permit and license functions discussed in this opinion were vested in the Federal Power Commission (FPC) which was created by the Federal Power Act. Because these FPC functions were later transferred to FERC when the FPC was dissolved, see 42 U.S.C. § 7172(a) (Supp. V 1981), the distinction between FERC and the FPC is irrelevant to this case. Both will thus be referred to as the "Commission."

2. Although the provision that is now labeled § 4(f) was originally labeled § 4(c), we will refer to this provision as § 4(f) throughout this opinion.

seems to have behaved. FERC cannot first ignore a statutory mandate that was designed to assist municipalities in their competition for permits and then declare that a municipality loses its rights for acting as Congress expected it would act without the mandate's assistance. In light of this we reverse.

## I. LEGAL BACKGROUND

To understand this controversy, one must first understand the Federal Power Act's licensing scheme and the importance to that scheme of the preliminary permit and the statutory preference for public development and operation of hydroelectric projects.

To promote development of hydroelectric power and to assure that that development would serve the public interest, Congress created a licensing scheme, administered by the Commission, for construction, operation, and maintenance of hydroelectric projects. 16 U.S.C. § 797(e) (1982). Licenses may have a duration of up to 50 years. *Id.* § 799. Although Commission licensing decisions are generally to be based on the policy of best "develop[ing], conserv[ing], and utiliz[ing] in the public interest the water resources of the region[,]" *id.* § 800(a), the licensing process is also structured to account for at least two related policy goals: promoting extensive data collection by applicants prior to their receipt of licenses and promoting public development and operation of hydroelectric projects.

Congress wanted license decisions to be made on the basis of detailed submissions that would include as much relevant data as possible. *See id.* § 802. And it believed that parties would only be willing to invest in collecting extensive data if there was some likelihood of a return. Congress thus empowered the Commission to issue preliminary permits for durations of up to three years that would entitle the holder to a priority at the license application stage and would thus give the prospective applicant sufficient security to invest in data collection and arrange financing. *See id.*

§§ 797(f), 798. Permit holders would be preferred over other license applicants so long as their plans are "at least as well adapted * * * to develop, conserve, and utilize in the public interest the water resources of the region." 18 C.F.R. § 4.33(h)(1) (1983). Indeed, even where a competing applicant has a superior plan the permit holder is entitled to be informed of "the specific reason why its plan is not as well adapted" and to be given "a reasonable period of time" to bring its plan up to the level of the competitor. *Id.* § 4.33(h)(2).

█ Congress also adopted a policy favoring public ownership of hydroelectric power projects. It required the Commission to give a preference to "States and municipalities" over private developers in all preliminary permit proceedings, license proceedings in which there is no prior permit, and license proceedings after the expiration of an earlier license. 16 U.S.C. § 800(a) (1982). In any such proceeding a state or municipality must receive the permit or license if its plan is at least as well adapted to serving the public's water resource interests as the plan of the private parties. *Id.* Where a private party's plan is superior, a state or municipality is entitled to be informed of the specific deficiencies and to be given a reasonable period of time to make its plan "at least as well adapted as the other plans." 18 C.F.R. § 4.33(h)(4) (1983). But in spite of the preference for public ownership, once a permit is issued, whoever has the permit has priority at the licensing stage over all competitors, be they public or private. *See Washington Public Power Supply System v. FPC*, 358 F.2d 840, 847 (D.C.Cir.1966), *rev'd and vacated on other grounds sub nom. Udall v. FPC*, 387 U.S. 428, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967).

As one might expect, this scheme focuses attention on the issuance of preliminary permits. At that stage a government entity entitled to a statutory preference must use that preference to get a permit or forever lose its statutory advantage to a private permit holder. Congress designed

the written notice requirement of Section 4(f) to assure public entities' ability to participate in the permit stage.

Section 4(f) of the Act authorizes the Commission to award permits, provided that it first issues two kinds of notices. First, the section mandates "[t]hat upon the filing of any application for a preliminary permit * * * the Commission, before granting such application, shall at once give notice of such application in writing to any State or municipality likely to be interested in or affected by such application[.]" 16 U.S.C. § 797(f). Second, the section mandates that the Commission "shall also publish notice of such application once each week for four weeks in a daily or weekly newspaper published in the county or counties in which the project or any part thereof or the lands affected thereby are situated."[3] *Id.* Both provisions seem to reflect a congressional desire to facilitate interested parties' knowledge of and possible participation in Commission proceedings.[4] The first notice provision, however, was primarily intended to allow states and municipalities to assert and thus protect their statutory preferences.[5] This case examines the consequences of FERC's failure to provide that required written notice to a municipality.

## II. Facts

On February 10, 1981 Energenics filed an application with FERC for a preliminary permit to study the feasibility of developing a hydroelectric project on the St. Vrain Canal at Station 497 + 30. The Canal, which transports water from Carter Lake, is 9.8 miles long and is part of an elaborate transmountain water diversion project known as the Colorado-Big Thompson (CBT) System. The CBT System was constructed and is primarily operated by the United States Department of the Interior's Bureau of Reclamation (Bureau) and serves to transport water from the western slope of the Rocky Mountains to the more arid eastern slope and plains of Colorado. The Bureau owns the St. Vrain Canal, but the Canal is operated and maintained entirely by NCWCD under a 1957 agreement with the United States.

On May 6, 1981, almost three months after Energenics filed its application, FERC issued two types of notices of the application. First, FERC entered a notice in the Federal Register. *See* 46 Fed.Reg. 36156 (May 11, 1981). That notice announced and described Energenics' proposal and it stated that the application was on file with the Commission for public inspection. It also gave the address of Energenics' president, explained that a copy of the application could also be obtained from him, and specified the procedure to be followed by those desiring to file comments, protests, petitions to intervene, or competing applications. The deadline for receipt of these filings was set as July 9, 1981, although those desiring to file competing applications could protect their rights by filing a simple "notice of intent" by July 9, to be followed by a competing application no later than September 9, 1981. *Cf.* 18 C.F.R. § 4.33(a)-(d) (1983). The location of the project was given simply as "on the St. Vrain Canal." No more specific location was given.

Also on May 6, 1981 FERC sent letters to state and municipal entities. The content of these notices was the same as that published in the Federal Register, but a map was attached to specify exactly where on the Canal the project was to be located. It is unclear who received these letters, but it is undisputed that one was not sent to NCWCD.

---

**3.** As initially passed the Act required newspaper publication "for eight weeks." This was reduced to four weeks by the Act of August 26, 1935, c. 687, Title II, § 502, 49 Stat 839.

**4.** *See also* 16 U.S.C. § 825g(a) (1982) (giving Commission broad authority to admit as a party in any proceeding before it any interested state or local government entity, competitors, representatives of consumers or security holders, "or any other person whose participation in the proceeding may be in the public interest").

**5.** *See* 56 Cong.Rec. 9762 (Aug. 30, 1918) (comments of Rep. Sinnott).

On May 19, 1981 FERC also published a notice, identical to that published in the Federal Register, in a local newspaper. It was republished on May 26, June 2, and June 9.

On August 7, 1981 FERC ordered that a preliminary permit be issued to Energenics. No competing applications had been filed, and "[n]o party or agency commenting on the application objected to issuance of the permit." Order Issuing Preliminary Permit, Record (R.) at 28, Joint Appendix (JA) 19. FERC also stated that the order would be final unless appealed within 30 days. R. 31, JA 22. No timely appeal was filed.

We should briefly discuss what NCWCD did learn and do prior to its December 10, 1981 petition to reconsider. NCWCD first learned that Energenics had filed an application for a permit relating to a project on the St. Vrain Canal when a member of NCWCD's Board of Directors saw the notice published in a local newspaper on June 9, a little more than one month after notices to other government entities were issued and one month prior to the deadline for comments and notices of intent to file competing applications. NCWCD responded to this published notice by trying to ascertain the exact location of the proposed project, and to do this it contacted the United States Interior Department's Bureau of Reclamation, which owned the Canal and with which NCWCD had an established working relationship. Unfortunately, the Bureau gave NCWCD an incorrect location. After examining that location, NCWCD concluded that it was not a feasible site and thus decided not to challenge Energenics' application.

After Energenics received its permit, it began to contact various government entities as part of its feasibility study. One of the entities contacted was NCWCD. On September 29, 1981, at a meeting with Energenics, NCWCD for the first time realized the correct location of the proposed project. This realization prompted

NCWCD to begin investigations into the feasibility of and its interests in a project at that location, and into its legal rights with respect to the matter. On November 13, 1981 NCWCD's Board of Directors resolved to petition FERC to reopen the proceeding and to submit a competing permit application. On December 10, 1981 NCWCD filed its petition for reconsideration and reopening.

After receiving a response from Energenics and a reply memorandum from NCWCD, but without holding hearings or making findings of fact, FERC, on February 8, 1982, issued a short order rejecting NCWCD's petition. The order stated:

> No good cause has been shown why Northern Colorado's petition[,] filed four months after issuance of the Director's order, should now be considered. Northern Colorado complains that it did not receive direct notice of the proposed project, but admits it received actual notice through a local newspaper that Energenics' application was pending. Northern Colorado claims that it did not take action to protect its interests because it received from the Bureau of Reclamation erroneous information pertaining to the location of the proposed project. However, after determining the proper location of the proposed project, Northern Colorado waited 72 days before filing its petition for reconsideration. Northern Colorado's petition for reconsideration is therefore rejected.

Order Rejecting Petition for Reconsideration, R. 81, JA 65, *reprinted at* 18 FERC (CCH) ¶ 61,098.[6] On February 26, 1982 NCWCD petitioned for rehearing, and on March 25 FERC rejected that petition. FERC stressed that it had rejected the earlier petition as untimely and would adhere to its practice of not entertaining petitions for the rehearing of an order denying reconsideration. Notice Rejecting Petition for Rehearing, R. 284, JA 79. NCWCD then petitioned this court for review.

---

**6.** Except for a short introductory paragraph, the material quoted in text is the entirety of FERC's order.

## III. Jurisdiction

FERC first raises questions regarding this court's jurisdiction. Section 313 of the Act, 16 U.S.C. § 825*l* (1982), provides that this court has jurisdiction over the orders of the Commission when a petition for review has been filed with us by "any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding." *Id.* § 825*l* (b). The section also provides, however, that this court shall not consider a petition unless the party had previously raised the objections in an application to the Commission for rehearing or "unless there is reasonable ground for failure to do so." *Id.* Under the statute, a party may apply for a rehearing by the Commission "within thirty days after the issuance" of a Commission order. *Id.* § 825*l* (a).

FERC argues that because NCWCD was not a party to the permit proceedings, and because it filed no application for rehearing within 30 days of the permit issuance, NCWCD's petition to this court is improper. We disagree.

■ Although not literally "a party," NCWCD's inability to become a party is precisely the basis of its objection. It would be grossly unfair to deny judicial review to a petitioner objecting to an agency's refusal to grant party status on the basis that the petitioner lacks party status. Such a petitioner must obviously be considered a party for the limited purpose of reviewing the agency's basis for denying party status. *See Public Service Comm'n of N.Y. v. FPC*, 284 F.2d 200 (D.C.Cir. 1960). Similarly, it would be unfair to declare the denial of an untimely effort to reopen a proceeding to be unreviewable, when the basis of the effort is the contention that, because a required notice was not given, a timely objection was infeasible. As Judge Wilkey wrote for this court in *City of Rochester v. Bond*, 603 F.2d 927, 938 (D.C.Cir.1979), where "a complainant was not a party to the agency proceeding, and * * * [where] a complainant objects to the agency's failure to give notice[,] * * * the proper course is to seek reconsideration

by the agency. If the matter is reopened, any ensuing final order then may be reviewed in accordance with the review statute. If[,] on the other hand, the agency for any reason declines to reopen the matter, that decision itself would be a statutorily reviewable order." *See also Investment Co. Institute v. Board of Gov. of FRS*, 551 F.2d 1270, 1280–1283 (D.C.Cir.1977); *Gardner v. FCC*, 530 F.2d 1086 (D.C.Cir.1976).

■ In this case NCWCD followed the procedure set out in *City of Rochester*. It petitioned for reopening and its petition was rejected. That rejection is a statutorily reviewable order under 16 U.S.C. § 825*l*, and NCWCD met all statutory prerequisites to review with respect to that order. The issue we review is therefore "the agency's reasons for not reconsidering its earlier order." *City of Rochester, supra,* 603 F.2d at 938. The standard, of course, is whether the Commission's "action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Investment Co. Institute, supra,* 551 F.2d at 1281, *quoting* Section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982).

## IV. FERC's Statutory Obligation to Give NCWCD Written Notice

At the center of this controversy is the contention that FERC breached its statutory obligation to give NCWCD individualized written notice of Energenics' permit application. Obviously, if FERC had no such duty, NCWCD's untimeliness cannot be excused. FERC and Energenics both contend that no breach of statutory duty occurred. In our view this is clearly wrong. FERC ignored the statute. Indeed, from its representations in its brief and at argument it appears that a conscious refusal to obey the statute's clear language has been a longstanding, though previously unannounced, policy.

### A. NCWCD's Status Under the Act

■ The statutory command that "the Commission * * * shall at once give notice

of [a permit] application in writing to any * * * municipality likely to be interested in or affected by such application[,]" 16 U.S.C. § 797(f), was intended to benefit government entities like NCWCD. In Section 3(7) the statute defines "municipality" as "a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power." 16 U.S.C. § 796(7). NCWCD was, at the time notices were given, a "municipality" under the Act. Although Colorado law had not granted NCWCD authority to generate electricity for wholesale sales until just after FERC's notice of Energenics' permit application, NCWCD had long since been granted authority to generate, distribute, and sell electricity for operation of its own works and facilities. *See* Colo.Rev.Stat. § 37–45–118(1)(k) (1973 & 1981 pocket part), as amended by Act of May 18, 1981 known as Senate Bill No. 105. While its status as a municipality also might conceivably be based on its similarity to an "irrigation" or "drainage" district, it is clear that its authority to "develop, transmit, utilize, and distribute" hydroelectric power places NCWCD within the literal language of Section 3(7).[7]

Assuming the correctness of NCWCD's allegations of fact, it also seems clear that NCWCD was "a municipality likely to be interested in or affected by [Energenics'] application." 16 U.S.C. § 797(f). Since 1938 NCWCD has operated under an agreement with the United States which empowers it to distribute water from the CBT System, and the St. Vrain Canal is an important part of NCWCD's system for distributing that water. Moreover, under an amendment to that agreement NCWCD

took over the St. Vrain Canal in 1957 and is responsible for operating and maintaining the Canal. Especially since NCWCD's right to operate the Canal is revocable should it not adequately maintain it, NCWCD would certainly have an interest in any construction of a hydroelectric project on the Canal. Finally, its interest could adequately be based on its own authorization to develop and utilize electric power.[8]

## B. *FERC's Refusal to Follow the Act's Clear Language*

FERC's decision not to send written notice to NCWCD was not the result of any specific determination regarding NCWCD's status under the Act. Instead, FERC asserts that, pursuant to a reasonable and consistently followed interpretation of Section 4(f), it has never given written notice to "irrigation district[s], drainage district[s]," or similarly specialized political entities. FERC's interpretation of Section 4(f), we are told, has always been that the provision required no more than the procedure described by the Commission's Executive Secretary in 1921, when he appeared as a witness before the House Select Committee on Water Power:

> We advertise in a newspaper, the newspaper with the largest circulation in every county affected by the project. We notify by letter the governor of the State and the head of every State department that is interested in waterpower development. We notify authorities and the mayor of any municipality in reach of the project.

*Proposed Amendments to the Federal Water-Power Act: Hearing Before the Select Committee on Water Power of the*

---

7. We note that NCWCD has in other cases been treated as a municipality by FERC. *See Energenics Systems, Inc.*, 19 FERC ¶ 62,573 (1982); *Mitchell Energy Co.*, 16 FERC ¶ 62,180 (1980). Although both cases involved awards of the municipal preference to NCWCD, we would reject any argument that "municipality" has a different meaning for purposes of a § 4(f) notice than for purposes of a § 7(a) municipal preference.

8. Because we can resolve the issue of NCWCD's status as a municipality "likely to be interested in or affected by [Energenics'] application" on the basis of its status prior to Colorado's May 18, 1981 grant of additional authority to it, we need not resolve the issue of whether such a grant, after notices have been issued, would place any additional obligations on FERC.

*House of Representatives on H.R. 14469, H.R. 14760, and H.R. 15126,* 66th Cong., 3d Sess. 89 (1921) (statement of O.C. Merrill, Executive Secretary, Federal Power Commission). FERC argues that Mr. Merrill's statement should be treated as a contemporaneous agency interpretation of the statute, and FERC asserts that it has consistently followed Mr. Merrill's interpretation. FERC also explains that "[i]n referring to mayors, Mr. Merrill thus drew a distinction between governments on the local level which typically have mayors (*e.g.,* towns, cities, and villages) and those which typically do not (*e.g.,* water authorities, drainage districts, irrigation districts). Only the former group received written notice." Brief for respondent at 21. The latter group, in FERC's view, would have to rely on the newspaper notices or the Federal Register notice.

FERC supports its position by citing to "the general proposition that considerable respect is due the interpretation given [a] statute by the officers or agency charged with its administration." Brief for respondent at 19, *quoting Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980) (internal quotation marks and citations omitted). As FERC argues, a "consistent and longstanding interpretation by the agency charged with administration of the Act, while not controlling, is entitled to considerable weight." Brief for respondent at 20, *quoting United States v. Nat'l Ass'n of Securities Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975). For a number of reasons, however, this well established principle of administrative law cannot validate what the Commission has done.

We stated in *Obremski v. OPM,* 699 F.2d 1263, 1269 (D.C.Cir.1983), that the limit placed on the judicial role by an agency's interpretation of a statute "assumes an adequately articulated administrative decision interpreting the relevant statutory law within a range of reasonableness." FERC's interpretation of Section 4(f) fails both for its unreasonableness in light of the statutory language and legislative his-

tory and for the inadequacy of its articulation by the Commission.

### 1. *The Act's language.*

The Supreme Court has stated: "[T]he starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). In this case the statute first provides that the Commission "shall at once give notice of [a preliminary permit] application in writing to any State or municipality likely to be interested in or affected by such application[.]" 16 U.S.C. § 797(f) (1982). Second, it defines "municipality" as "a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power." *Id.* § 796(7).

The statutory definition of "municipality" thus expressly includes those entities that FERC now contends it can expressly exclude in interpreting the notice provision. Moreover, although a requirement of written notice is generally understood to mean personal notice, *see NLRB v. Vapor Recovery Systems Co.,* 311 F.2d 782, 785 (9th Cir.1962), FERC argues that certain types of municipalities should have to rely on general public newspaper and Federal Register notices, even though the statute specifically states that they are entitled to "notice[s] * * * in writing." In addition, although the statute is unambiguous and, using the word "shall," is written in "the language of command[,]" *Ass'n of American Railroads v. Costle,* 562 F.2d 1310, 1312 (D.C.Cir.1977), FERC views itself as free to exercise broad flexibility in deciding what meets its obligation to Congress.

### 2. *The legislative history.*

The statute says "shall," but FERC argues that two statements from the brief

House of Representatives debate on the provision show that great flexibility was intended. FERC first cites to a statement made by Representative Sinnott, the provision's sponsor. Responding to a suggestion that the Commission be required in each permit proceeding to demand proof that proper notices were mailed and published, Representative Sinnott stated that he did not want things to become "too complicated," that he preferred that the provision be "directory rather than jurisdictional," and that the matter should "rest with the Commission." 56 Cong.Rec. 9763 (August 30, 1918). FERC's second citation is to a comment by Representative McLaughlin, who criticized the proposed provision by arguing that "to require notice to the counties interested or affected by" a project would present problems because "[i]t would be difficult for anyone at the beginning of a project to know what counties are affected or may later be affected." *Id.*

For a number of reasons these quotes from legislative floor debate do not persuade us to deviate from the statute's clear language. Neither statement is unambiguous. Representative Sinnott was responding to a suggestion that the Commission, in its proceedings, should, as a jurisdictional prerequisite, have to demand and receive proof that proper notices were sent. The discussion may thus have only concerned the issue of whether proof of the notices should be required; it was not necessarily concerned with whether the sending of the notices should be required. Similarly, Rep-

resentative McLaughlin's complaint, which was never directly answered or discussed, may have been directed at the newspaper publication requirement as contained in the initial proposal. Indeed, an amendment on that subject was immediately offered and adopted.[9]

 In any case, the significance of such comments from legislative floor debates is limited, not only because of such clear statutory language, but also because "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history. [Even the sponsor's] statement must be considered with the Reports of both Houses and the statements of other Congressmen." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979).

In this case material from the Conference Report supports the statute's plain meaning. One difference between the Senate and House versions of the Federal Power Bill was over whether public notice and notice to government entities should be provided when there were license applications. The Conference Report spoke in "the language of command." It stated that the final bill "provides that upon the filing of any application for a license which has not been preceded by a preliminary permit under [16 U.S.C. § 797(f) (1982)], notice *shall be given and published as required* by the proviso of said subsection." H.R.Conf.Rep. No. 910, 66th Cong., 2d Sess. 8 (1920) (emphasis added). State-

9. As originally offered the newspaper publication requirement provided that the Commission "shall * * * publish notice of such application * * * in a daily or weekly newspaper published in the county or counties affected by said application." 56 Cong.Rec. 9762 (Aug. 30, 1918). Representative McLaughlin initially phrased his critique in terms of the requirement of "notice to the counties interested in or affected by" a project. This left the object of his critique ambiguous: *i.e.,* was it the municipal or the newspaper notice provision? The former notice provision included the word "interested" but did not mention "counties," and the latter referred to "counties" but only used the word "affected."

Representative McLaughlin's principal concern, however, was in requiring the Commis-

sion to predict which counties would ultimately be affected by a project. He felt that many projects might affect distant counties and that predicting a project's ultimate effect would be hard. These concerns would have been less pressing with respect to the municipal notice provision since that provision, written in less absolute terms, applied only to those entities "likely" to be affected. In any case, the matter was disposed of when Representative Anderson responded by offering an amendment making the newspaper notice provision only applicable to counties "in which the project or any parts thereof or the lands affected thereby are situated." 56 Cong.Rec. 9762 (Aug. 30, 1918). Representative McLaughlin made no further comment.

ments in a conference report, because commended to the entire Congress, carry greater weight than comments from floor debates by individual legislators. *See American Jewish Congress v. Kreps*, 574 F.2d 624, 629 n. 36 (D.C.Cir.1978); *see also Vitrano v. Marshall*, 504 F.Supp. 1381, 1383 (D.D.C.1981) ("Perhaps the most useful document illuminating Congressional purpose is a Conference Report which bears on the final draft that is used by the conferees in explaining to the entire Congress why the bill should pass.").

Although there are very few comments on the notice provision in the general legislative debate, at least one supports the clear meaning of the language and the interpretation of the Conference Report. Senator Phipps, concerned that the bill gave too much preference to municipalities, made clear that his understanding was that the provision was a mandatory directive to the Commission. *See* 59 Cong.Rec. 1173 (January 7, 1920) ("it is not only the privilege but the duty of the commission in case of a filing to call the attention of a municipality which might be interested therein to that filing"). No one disputed this understanding.

3. *The Merrill statement's inadequacy as a contemporaneous agency interpretation consistently applied.*

 Just as we must reject FERC's reliance on legislative history to justify its practice with respect to the municipal notice provision, we must also reject its assertion that the 1921 comment by the Commission's Executive Secretary while testifying to a House committee amounted to the type of contemporaneously articulated and consistently followed agency interpretation to which we would owe deference. It has long been accepted that an important factor to be considered in giving weight to an agency's interpretation of the statute it enforces is "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking

power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Where the agency has shown little evidence of the reasoning that went into its contemporaneous position, that position has been accorded little deference. *See Adamo Wrecking Co. v. United States*, 434 U.S. 275, 287 n. 5, 98 S.Ct. 566, 573 n. 5, 54 L.Ed.2d 538 (1978). Here, not only is there no reasoning contained in the statement offered by the agency as its contemporaneous understanding of the statute, there is no clear evidence of the statement's meaning, its completeness, or even its status as an authoritative construction of the statute in the view of the agency or, indeed, in the view of the official who made it. In fact, the Commission has not even been able to show this court any evidence that it has so much as referred to this statement, much less relied on it as policy, at any point in the more than 60 years since the statement was made.

The 1921 statement contained no reasoned interpretation, or even a mention, of the statute's notice provision. It was a brief and general, matter-of-fact description of then-current agency practice. The reason for the statement's brevity and generality is clear from the statement's context. The hearing was simply not focused on the Commission's interpretation of the statute's particular parts. It was concerned with the personnel needs of the Commission and with the question of how extensive the Commission's authority to hire personnel should be. Specifically, the hearing was on a bill to authorize the Commission to hire personnel for the first time. The statement cited as authoritative by the Commission was in response to a general question that was directly concerned with neither the notice provision nor the Commission's personnel needs; it was concerned with whether the Commission had sufficient statutory power to conduct permit and license hearings and to open them to all interested parties. The statement was simply a part of a short answer that generally described the Commission's then-

current practices.[10] Such a statement was not likely to have been intended or understood as an authoritative construction of a statute's meaning, nor could it serve as such. *Cf. SEC v. Sloan*, 436 U.S. 103, 117–119, 98 S.Ct. 1702, 1711–1712, 56 L.Ed.2d 148 (1978); *Adamo Wrecking Co. v. United States, supra*, 434 U.S. at 287 n. 5, 98 S.Ct. at 574 n. 5; *Robzen's Inc. v. U.S. Dep't of Housing*, 515 F.Supp. 228, 235 n. 12 (M.D.Pa.1981).

Even if we were willing to view the statement by Executive Secretary Merrill as an authoritative statement of the Commission's contemporaneous understanding of its statutory responsibility, the statement would not necessarily help FERC's position. Apart from the fact that FERC seems never to have publicly stated its subsequent adherence to the statement,[11] the statement itself is unclear and easily understood as far more in conformity with the statute's plain meaning than is FERC's present position. Merrill stated that he sent letters to "the head of every State department that is interested in water power development," a vague classification that would not obviously exclude specialized "municipalities" like NCWCD. Whatever the Commission practice may have been, Merrill's statement of that practice revealed nothing approximating the Commission's current cavalier willingness to ignore the statute's terms.

### 4. The Merrill statement's inadequacy as an indication of legislative acquiescence.

FERC's other argument that relies on the Merrill statement can similarly be rejected. FERC argues that the statement put Congress on notice of the Commission's interpretation and thus Congress, by not amending the statute, acquiesced in that interpretation. *See* brief for respondent at 21. This theory is unpersuasive for all the reasons discussed above, and also because there is no reason to believe that Congress was generally aware of the statement. The Supreme Court has said: "We are extremely hesitant to presume general congressional awareness of the Commission's construction based only upon a few isolated statements." *SEC v. Sloan, supra*, 436 U.S. at 121, 98 S.Ct. at 1713. And the *Sloan* statement was made in a case where the argument for congressional knowledge and approval was somewhat better than it is here. In *Sloan* a congressional committee had apparently recognized and approved of the commission practice at issue. *See id.* at 119–120, 98 S.Ct. at 1712–1713.

### 5. The Merrill statement's inadequacy as a reasonable rule of procedure necessitated by practical considerations.

FERC's last argument is somewhat different. The Commission argues that prac-

---

**10.** A tremendous backlog of applications had developed, and this gave rise to the hearing on the Commission's personnel needs. After discussing the backlog, Executive Secretary Merrill answered a question from Representative Sinnott on how long it would take to process then-pending applications if additional personnel were provided. Representative Raker then interjected:

> Mr. Raker. Supplementing the remarks of [Representative Sinnott], suppose there is an objection filed to the granting of a permit. * * * [Y]our commission has ample power now under the law to set a time for hearing and hear all interested parties on the question of whether or not the permit should be granted and finally whether the license should be granted.
> Mr. Merrill. We are doing it right now.
> Mr. Raker. So there is no question about that?

> Mr. Merrill. There is no question. We advertise in a newspaper, the newspaper with the largest circulation in every county affected by the project. We notify by letter the governor of the State and the head of every State department that is interested in water power development. We notify county authorities and the mayor of any municipality in reach of the project.

*Proposed Amendment to the Federal Water-Power Act: Hearing Before the Select Committee on Water Power of the House of Representatives on H.R. 14469, H.R. 14760, and H.R. 15126*, 66th Cong., 3d Sess. 89 (1921). This was the entirety of the relevant discussion as the focus of the questions remained on the Commission's unmet needs.

**11.** *See* the discussion in note 12 *infra*.

tical considerations of limited resources and administrative feasibility require that the agency be given the latitude necessary to pursue the statutory scheme. In effect, it argues that strict adherence to the statute's language would be administratively impossible.

> [N]otice to municipalities is an area which necessarily requires administrative flexibility. For example, in administering the statute, even with regard to cities and towns, the Commission must define what constitutes a potentially "interested or affected" municipality, language which on its face may include [a] large number of governmental units. * * *

Brief for respondent at 21–22. Given this need for flexibility, FERC contends, its practice of failing to notify "specialized municipalities" is reasonable:

> There exist in the United States an estimated 50,000 specialized local governmental units performing a myriad of services. Unlike states, counties and cities, many of these governments, such as water, utility or drainage districts, are not readily identifiable.

*Id.* at 22.

Although we sympathize with FERC's practical concerns, we must reject its contention that those concerns can justify the Commission's practices. Any administrative approach developed would have to be adequately articulated and within a range of reasonableness with respect to Congress' instruction. *Cf. Obremski v. OPM, supra,* 699 F.2d at 1269. We have already discussed the unreasonableness of current FERC practices in relation to Congress' language and goal, and the inadequacy of the Merrill statement as an inter-

pretation of congressional intent. When offered as a rule of administrative practice demanded by practical necessity, the statement suffers from the same flaws as well as an additional deficiency. "[I]n such a case the agency must, at a minimum, let the standard be generally known so as to avoid both the reality and the appearance of arbitrar[iness]." *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). Those relying on the procedures set out in a statute have a right to know that those procedures are being given less than their clear meaning. Here, FERC seems never to have made a public statement that clearly purports to explain its notice policies.[12]

## V. THE CONSEQUENCES OF FERC'S FAILURE TO GIVE NCWCD THE REQUIRED NOTICE

Having established FERC's statutory obligation to NCWCD, we still need to determine the consequences of FERC's breach of that obligation. In its rejection of NCWCD's petition for reconsideration, and more emphatically in its arguments to this court, FERC emphasized two points. First, the Commission argues that on June 9, 1981, prior to the close of proceedings, NCWCD received "actual notice" when one of its Directors saw the last of the newspaper notices. In FERC's view this was sufficient to negate NCWCD's challenge. Second, and more important, FERC argues that NCWCD admits having received all relevant information by September 29, 1981, and yet it waited until December 10 to seek reopening. FERC argues that that delay alone would merit rejection of the reopening petition.

---

12. We have been directed to no published Commission statements purporting to explain general municipal notice policies, or even to any prior Commission references to the Merrill statement. The only statement of municipal notice policy seems to be a recent FERC opinion—issued after the proceeding in this case—which rejected the appeal of a town located one mile from the proposed project. FERC simply stated that its policy has been to notify towns only if they had at least 5,000 population and were located within 15 miles of a proposed project. The appellant was a town of less than 5,000. *City of Idaho Falls,* 20 FERC ¶ 61,066 (1982). Although the validity of the policy followed in *Idaho Falls* is not before us, we note that it runs counter to at least the literal wording of the Merrill statement. That, combined with the fact that no reference was made to the Merrill statement (or any other prior Commission statement of policy), makes us doubt that the Merrill statement has been as consistent a policy guide as the Commission contends.

**1522**

### A. The Assertion That NCWCD Received "Actual Notice" Through the June 9 Newspaper Notice

We reject the argument that the observation by one member of NCWCD's Board of Directors of the June 9 newspaper notice gave NCWCD sufficient "actual notice" of Energenics' application. It is undisputed that that notice did not contain the precise location of the proposed project and that NCWCD called the Bureau of Reclamation of the Department of the Interior to find that information. It is also undisputed that the Bureau gave NCWCD incorrect information and that as a result NCWCD chose not to pursue the matter. FERC, however, argues that it certainly had no statutory obligation to give in its municipal notices more information than it actually gave in its published notice, and thus any statutory violation was harmless. Moreover, FERC argues that the published notices directed that inquiries be made either to the Commission or to Energenics—and not to the Bureau—and thus it cannot be held responsible for NCWCD's receipt of incorrect information.

We need not decide whether the notice published in the newspaper and the Federal Register would have been sufficient to fulfill FERC's Section 4(f) municipal notice obligation had it been sent out as a direct municipal notice. The fact is that FERC did mail a notice to some government entities pursuant to the municipal notice provision and that that notice, unlike the published version, did specify the exact location of the project. FERC implicitly made a determination that that information was appropriate for government entities, and NCWCD was statutorily entitled to that same information.

We also need not go into great detail analyzing the degree of clarity of the published notice or the degree of reasonableness of FERC's response. It is enough to note that the notice did not unequivocally direct inquiries to either FERC or Energenics. At various points the notice stated: first, that Energenics' application was on file and available for public inspection "with the Commission"; second, that "[c]orrespondence with the [a]pplicant should be directed to" Energenics' president, whose address was listed; third, that "[a] copy of the application may be obtained directly from the [a]pplicant"; and fourth, that any filings should be sent, in the required form, to the Commission and to the applicant. NCWCD responded by contacting the Bureau of Reclamation, which owned the relevant land and with whom NCWCD had an established relationship. Its goal was not to obtain a copy of the application, but only a very basic and simple piece of information. On its face, it does not seem unreasonable to have expected Bureau to have known it. We can thus conclude that the reading of the June 9 notice did not make harmless FERC's failure to fulfill its statutory obligation.

 A legislature, in order to take into account the particular circumstances and protect the particular interests of certain potential parties, may surely mandate that an administrative agency give them notices in a specific manner. That legislative power would be made meaningless if an agency could freely ignore the mandated manner to the recipient's harm. Because here NCWCD did not receive the same actual knowledge from the published notice that it would have received from the direct municipal notice, and because that deficiency may have made a difference in its failure to participate in the proceedings, FERC's failure to comply with the statute was not clearly made harmless by any "actual notice" received by NCWCD before the permit was issued.

### B. FERC's Contention That NCWCD's 72-Day Delay Made the Petition Untimely

██ All parties agree that on September 29, 1981 NCWCD learned the actual location of Energenics' proposed project from Energenics itself. This knowledge prompted NCWCD to begin the process of, first, evaluating that location to decide if it had the interest and capacity to compete with Energenics for the right to construct

and operate a project there; second, determining its legal rights and strategies concerning such competition; and third, preparing the legal papers for its petition to reconsider and reopen. At its monthly meeting on November 13, 1981 the NCWCD Board of Directors authorized NCWCD to file a competing application, and on December 10, 1981 (72 days after learning of the location) NCWCD petitioned for reconsideration of the permit issuance and for reopening to permit filing of a competing application. Without a hearing, FERC rejected the petition as untimely.

Because this case comes to us lacking any factual findings, we cannot decide the issue of whether the 72-day delay was reasonably excusable, but for a number of reasons we must reverse FERC's decision that, assuming the truth of all facts alleged by NCWCD, the petition was still inexcusably untimely. In reaching this conclusion we are not holding that waiting such a long period of time is generally acceptable in efforts to reopen an administrative proceeding. That is clearly not the case. But this case involves a number of special circumstances. We are influenced by the time limits contained in FERC's own practice, by the legislative history of the Federal Power Act's notice provision, and by the particular facts of this case.

The significance of NCWCD's 72-day time period should in part be evaluated in light of the time periods given to parties in FERC's own proceedings. We assume that those periods reflect FERC's views of how long various tasks and decisions should reasonably take. In this case FERC first issued notices of Energenics' application on May 6, 1981 and listed July 9, 1981 (64 days later) as the last date for comments, protests, or petitions to intervene. The notices also explained that anyone interested in filing a competing application could, under 18 C.F.R. § 4.33(b) & (c) (1983), protect that interest by filing, on July 9, a relatively simple notice of intent.[13] The Commission

would then give them until September 8, 1981 (126 days after the initial notice) to prepare and file the application.

In evaluating the significance of the 72-day time period, it is relevant to ask what sort of behavior Congress deemed foreseeable in the absence of proper notice. Thus it is relevant that Congress' passage of the municipal notice provision seems to have been motivated by the belief that it was needed because the types of entities within the statute's definition of municipality would be unable to easily recognize their interests and quickly act on them. This seems to have been the point of the provision's sponsor as he explained its purpose to the House of Representatives:

> It is well known * * * that municipalities and public officials are often very dilatory and that they sleep upon their rights. It seems to me it is wise to provide that as soon as an application is filed by any person or corporation that notice shall be at once given to the various municipalities, which mean the county, city, irrigation district, drainage district, or other political division of the State * * *. This will bring knowledge directly home to the * * * officials and give them an opportunity to present their application if they desire public or municipal ownership, where otherwise the matter would be entirely overlooked and snap judgment would be taken against them * * *.

56 Cong.Rec. 9762 (August 30, 1918) (statement by Representative Sinnott). Of course, this recognition by Congress cannot mean that once notice is deficient a municipality can learn the relevant information and then freely sleep on its rights. But it should influence the evaluation of a municipality's behavior, since a municipality should not lose its rights if its response was within congressional expectations. Congress seems not to have expected municipalities to be able to file competing applications with exemplary promptness after casually or informally coming upon the nec-

---

13. A notice of intent to submit a competing application need only include (1) the name, address, and telephone number of the prospective applicant, and (2) "an unequivocal statement of intent to submit a specific type of application." 18 C.F.R. § 4.33(b)(1)(2) (1983).

essary information, and this factor should at least lead us to look at the issue with some flexibility.

Given these factors, we must conclude that the decision to reject NCWCD's petition for reopening, reached as it was without a hearing or any fact-finding, was an abuse of discretion. For a number of reasons the passage of 72 days, in and of itself, cannot sustain FERC's conclusion. FERC's own procedures allow a municipality which receives proper notice to take more than 60 days to reach a decision on whether it wants to compete. At that point it need only file a simple notice of intent to gain approximately 60 more days for preparing its application. Most important, the notice sets out the exact procedure to follow, the exact due dates, the option of protecting interests with a notice of intent, etc. Thus potential parties need not expend time and effort determining what is expected of them. The facts here, in contrast, presented NCWCD with the information in a piecemeal fashion and placed it in the situation of having to argue a theory of reopening that appeared never to have publicly arisen before. FERC's regulations did not explain what constituted proper notice, nor did they explain what a municipality in NCWCD's position was expected to do. Although FERC here argues that all NCWCD would have had to do was file the simple notice of intent, no public statement by the Commission stated that this would have been appropriate. Given the fact that the petition was less than two weeks late, as compared with FERC's normal period for requiring the short notice of intent, given that this sort of delay and confusion was what Congress expected and thus sought to avoid by requiring direct, unambiguous, written notice, and given that FERC placed NCWCD in a position in which neither FERC's stated procedures nor its precedents gave NCWCD any clear guidance, we find it an abuse of discretion to have denied the petition on the facts alleged.

We reverse FERC's conclusion that 72 days was so untimely that, even if the explanation offered was true and complete, it would not be reasonable. FERC may of course hold hearings at which NCWCD may be required to prove the facts in its allegations. And, of course, at such hearings NCWCD's allegations may be examined, impeached, or cast in a different light by new facts, and as a result NCWCD's behavior may be found to have been unreasonable. But such a finding would have to be based on NCWCD's failure to prove its factual contentions or on the presentation of significant new facts not currently before us. On the facts contained in the record before us, FERC could not have validly reached that determination.[14]

*Reversed and remanded.*

MacKINNON, Senior Circuit Judge, concurring.

I concur with the majority's decision to remand this case to the Commission for a hearing to determine whether the facts justify a reopening to permit the district to apply for a temporary permit. In reaching that conclusion, however, I disagree with much of the majority's analysis—primarily its apparent eagerness to decide several substantial issues in the complete absence

14. Intervenor Energenics has raised the issue of prejudice, arguing that the equities favor not reopening because it had relied on its receipt of the permit and so expended significant amounts of time and money during the 72-day period. But the simple fact of Energenics' losses cannot prevent a reopening. NCWCD is asserting a right given by statute and undermined by the Commission. Any prejudice that resulted from delays that followed reasonably or foreseeably from the Commission's misdeeds cannot be a basis for denying reopening.

Energenics' contention, however, does point out the importance of rapidly resolving this dispute. Because of FERC's refusal to take seriously a provision of its underlying statute, the development of a worthwhile water project has been needlessly delayed and the interests of both Energenics and NCWCD have been injured and kept in a state of uncertainty. Moreover, because of FERC's behavior, there is a chance of further litigation as rights are disposed of with finality prior to even the issuance of a license (*i.e.,* if NCWCD is once again denied the ability to reopen or, if the proceeding is reopened, when one party is denied the permit on the merits). We thus hope that FERC will now proceed with care, responsibility, and dispatch.

of any factual record. I agree that the Conservancy District's allegations must be accepted as true for purposes of this appeal, but I cannot agree with the majority's apparent determination to decide some of the underlying substantial issues as if the facts asserted by the Conservancy District in its brief were facts developed on a record after a hearing. It is elementary that "[n]o court should decide an issue that has not been properly clarified and no court should decide any question without needed facts." 4 K. Davis, Administrative Law Treatise § 25:11 (2d ed. 1983). This restraint is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to *protect the agencies from judicial interference.*" *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (emphasis added). Accepting allegations as true for purposes of deciding this appeal and remanding the case is one thing, but accepting them as true for purposes of deciding how the Commission should decide the case on remand after hearing is something else entirely. We have no authority to do the latter.

### I.

I concur generally that *for purposes of this appeal* the Conservancy District can *now* be considered a "municipality *likely* to be interested ... or affected" (emphasis added) by the Energenics project. But I cannot agree that this necessarily can be transformed into a decision that on *May 6, 1981*, when the Commission sent out the notices, the District was "likely to be interested" in a project the size and character of Energenics' proposal. May 6, 1981, was *before* the Colorado statute was amended to permit Conservancy Districts to *whole-*

*sale* power, and there is strong circumstantial evidence that the passage of the amendment may have been the *only* event that placed the District in the "likely" status. When the Commission sent out the notices the District did not have authority to wholesale power, and this is a fact from which it might be inferred that the District was *not* a municipality likely to be interested. Insofar as it might be likely to be "affected," the published notice, by designating the "St. Vrain Canal," might be considered as giving all the notice that was necessary to alert the District that operated the St. Vrain Canal.

It is not clear that the Conservancy District was, in fact, a "municipality likely to be interested" in Energenics' petition *on the date* that the Commission's notices were sent out to municipalities. As of that date, Colo.Rev.Stat. § 37–45–118(j) provided that the District had the authority to "construct, operate, and maintain ... power plants." But § 37–45–118(k) specifically provided that this was a power limited to its own "works and facilities":

> Nothing provided in this article shall be construed to grant to the district or board the power to generate, distribute, *or sell* electric energy, except for the operations of the works and facilities of the district.

(Emphasis added.) The Conservancy District did not receive "authority to generate electricity for wholesale sales" until May 18, 1981—just after FERC had mailed its notices of Energenics' permit application.[1] Majority at 1516. The majority and the parties agree that the Conservancy District had authority before that date to "generate, distribute, and sell electricity for operation of its own works and facilities," Majority at 1516, but there is nothing in this record to support a conclusion one way or

---

**1.** This statute, as amended by the act approved on May 18, 1981, provides:

Nothing provided in this article shall be construed to grant to the district or board the power to generate, distribute, or sell, OR CONTRACT TO SELL electric energy except for the operation of the works and facilities of the district AND EXCEPT FOR WHOLESALE SALES OF ELECTRIC ENERGY WHICH MAY BE MADE BOTH WITHIN AND WITHOUT THE BOUNDARIES OF THE DISTRICT OR SUBDISTRICT.

Colo.Rev.Stat. § 37–45–118 (as amended, May 18, 1981). The capitalized language was added to the section by the amendment.

the other that with such limited authority it was "likely to be interested" in constructing, for its own purposes, a project of the character or size proposed by Energenics. In fact, the present application, which seeks to wholesale the power developed, may be *some* indication that it was *not* interested in producing power within the limitations of the prior statute.

Assuming that it had some limited authority before the May 18 legislative amendment, it does not follow inexorably that the Conservancy District was therefore a municipality "likely to be interested" in building a 2.1 MW power plant, the only apparent purpose of which would be the generation of electricity for wholesale. The majority points out that the Conservancy District has been treated as a municipality in two other proceedings, but does so without admitting that *both* of these permits were granted *after* the May 18 legislative amendment, which was passed *after* the notices were sent to municipalities in this case.

In fact, the first recorded instance of the Conservancy District's interest in building facilities of this magnitude came on May 5, 1981, the day before notice of Energenics' application was issued. Perhaps aware of the likely passage of the pending amendment by the Legislature, the Conservancy District applied on that date for a permit to "utilize an existing dam" to build a generating unit at another location for *wholesale use. Mitchell Energy Co.*, 16 FERC ¶ 62,180 (Aug. 5, 1981). The proposed facility was a 2 MW generating plant with an annual output of 4,000,000 kWh, but the

"plan [was not] based on detailed studies." *Id.* The Conservancy District announced that it planned to sell the power to Public Service Company of Colorado or another retail utility.

The next year, the Conservancy District filed for another permit in *Energenics Systems*, 19 FERC ¶ 62,573 (1982). The permit in that case involved a 5.2 MW facility, with an annual capacity of 7,000,000 kWh. The Conservancy District stated that it would sell the power to Public Service Company of Colorado. Both permits were eventually awarded to the Conservancy District well after the effective date of the 1981 amendment of the Colorado statute.

The Conservancy District's sudden interest in developing facilities for the *outside* sale of power—after having apparently applied for no such permits in the first 40 years of its existence—might be considered as implicit proof that it had neither the authority nor the interest to build such facilities prior to May 18, 1981. But it is impossible, on the record before us, to reach that determination.

On remand, it is my view that the *Commission*, which now has the benefit of this court's construction of the notice provision, should decide whether or not the Conservancy District was a "municipality likely to be interested" in competing for Energenics' permit at the time the notices were sent out.[2] If not, the Commission's failure to give notice would be harmless, unless it had an affirmative duty to sent notice *after* learning of the 1981 amendment by the Colorado Legislature.[3]

---

**2.** The majority states that the Conservancy District might be an "interested" municipality merely because it operates the canal in question. Majority at 1516. The purpose of the municipal preference, however, is not to provide notice to municipalities which may generally be interested in keeping informed, but to alert municipalities which may wish to compete for the permit in question. I fail to see how Congress's avowed purpose—to encourage municipal power development—would be furthered by requiring the sending of notices to municipalities which lack authority or desire to develop power, on the sole ground that they might like to know. The notice provision was expressly designed to give notice to municipalities so

that they would have "an opportunity to present their application if they desire public or municipal ownership." 56 Cong.Rec. 9762 (Aug. 30, 1918) (statement of Rep. Sinnott). I believe that the statute requires notice only to those local entities with the actual authority *at the time* to compete for the permits in question. The Conservancy District's authority as of the time the Commission sent out notices of the Energenics application thus is critical to this case.

**3.** If the Commission were to find that the Conservancy District was not a municipality likely to be interested as of May 6, 1981, it would have to decide whether the district's changed status

## II.

The majority dismisses out of hand the argument that the Conservancy District's admitted actual knowledge of the contents of the published notice on June 9 was sufficient to satisfy the statute's notice requirement: "We can thus conclude that the reading of the June 9 notice did not make harmless FERC's failure to fulfill its statutory obligation." Majority at 1522. The majority is willing to concede that at *some* point actual knowledge renders the provision of written notice superfluous.[4] The question then becomes *when* did the Conservancy District's board have sufficient knowledge of the Energenics' application that it should have begun taking steps to protect its interest? Did it have sufficient knowledge—

1. When the board became aware of the published notice on June 9?

2. When the board received a letter from Energenics in late August pinpointing the exact location of the proposed facility at a specific station on the 9-mile canal?[5]

3. When the board met with Energenics on September 29 and was told again the exact location of the proposed facility?

Or was it on some other date? The majority, without the necessary *facts* before it, apparently makes the substantive holding that notice was plainly insufficient as of the first date. That, however, is a fact that must be the subject of determination at the hearing. (The minutes of the meetings of the District's board of directors might cast some light on this issue and others.) The majority ignores the second date, which should not be done. It selects September 29 as the date on which the Conservancy District received the actual notice required by the statute, holding that the failure to specify exactly *where* on a 9-mile canal the project would be located rendered the published notice fatally defective, at least as applied to the Conservancy District. Majority at 1522.

as of May 18, 1981, required the Commission to take affirmative action to send additional notice *after* that date. I agree with the majority that this question need not be addressed at this time and that we have not decided that issue.

4. "Of course, this recognition by Congress [that municipalities are not mindful of their rights] cannot mean that once notice is deficient a municipality can learn the relevant information and then freely sleep on its rights." Majority at 1523. This is in line with what I understand to be the general rule in administrative cases: actual notice to the affected party is sufficient, even if the statute mandates personal service. *See Converse v. Udall,* 262 F.Supp. 583, 592 (D.Or.1966) (Surface Resources Act requires copy of notice to be personally served on mine claimants, but plaintiffs could not contest lack of personal service since they "were completely informed of the notice of publication"), *aff'd,* 399 F.2d 616 (9th Cir.1968), *cert. denied,* 393 U.S. 1025, 89 S.Ct. 635, 21 L.Ed.2d 569 (1969). *See also Hunter v. Atchison, T. & S.F. Ry.,* 188 F.2d 294, 301 (7th Cir.), *cert. denied,* 342 U.S. 819, 72 S.Ct. 36, 96 L.Ed. 619 (1951) (plaintiffs could not complain of lack of formal notice, since "[a]ctual notice for a sufficient period ... is all that is required"); 73A C.J.S. *Public Administrative Law & Procedure* § 135 (1983) ("one having actual knowledge is not prejudiced by, and may not complain of, a failure to receive formal notice"). The Commission, more than 30 years ago, came to the same conclusion.

*See* Warrior River Elec. Coop. Ass'n, 11 F.P.C. 693, 702 (1952).

5. The Conservancy District admits that in *late August* it received a letter from Energenics detailing the *exact* location of the project, but explains that it *did not look at the location carefully* because it previously had been misled by the Bureau of Land Reclamation. Brief of Petitioner at 8 n. 8. The majority ignores this statement, but further development of this point seems necessary in order to judge the reasonableness of the Conservancy District's delay. Is the applicant to be held responsible not only for the Commission's failure to give the District notice with a map, but also for the possible negligence of the District in not examining a complete notice that was placed before its very eyes by the applicant? That might be considered as placing a premium on compounding negligence. The Conservancy District in August, 1981, cannot be considered as a novice in such matters, as the record indicates it had filed an application for a preliminary permit, under identical circumstances to the present case, on May 5, 1981, following the application by Mitchell Energy Co. on November 17, 1980. Piggybacking on applications of others and presenting plans after considerable delay was not a new tactic for the District. *See* Mitchell Energy Co., 16 FERC ¶ 62,180 (Aug. 5, 1981).

The majority relies on the fact that the Commission *did* send maps to other municipalities; from this, the majority extracts an "implicit[ ] ... determination" that a map was necessary to properly advise governmental units of the project's location. Majority at 1522. The majority offers no support for the proposition that notice to *A* is defective if notice to *B* contains extra information not included in the notice to *A*. On the contrary, *A* is entitled to such notice as will reasonably apprise it of the nature and location of the project in question, regardless of what information *B* gets.

By incorporating this implicit determination—which the Commission strenuously denies making—the majority rather neatly avoids a problem that simply cannot be resolved on this deficient record: how much information was it necessary to include in the notice to inform the Conservancy District of its rights? That question is the key to whether or not the board's *actual knowledge* of the published notice was sufficient. It requires a hearing and determination of relevant facts. It cannot be evaded by reliance on an entirely unsupported proposition such as that *A*'s notice is defective because *A* did not get the map that *B* received.[6]

The statute in question requires that the Commission "at once give notice of such application in writing" to interested municipalities that qualify. It does *not* specify how specific the notice must be. Ordinarily, in administrative procedures where personal notice is necessary, administrative agencies "are governed by the same basic requirements of fairness and notice," including "specificity of notice and opportunity to respond," as are courts. *Hess &*

*Clark v. FDA*, 495 F.2d 975, 984 (D.C.Cir. 1974). "The basic principle [is] that a party is entitled to such notice as will provide reasonable opportunity to prepare ...." 3 K. Davis, Administrative Law Treatise § 14:11 (2d ed. 1980). "The notice must be of such nature as reasonably to convey the required information ...." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).[7]

The notice received by the Conservancy District was either sufficient to apprise it of the necessary facts, or it was not. Notice sent to other interested parties is irrelevant. Under *Mullane*, the adequacy of notice requires a factual inquiry. On remand, the Commission should be permitted to determine at what point the Conservancy District had sufficient notice of the Energics application. Contrary to the implication discerned by the majority, the Commission has *not* done so. In that investigation the August letter should not be ignored.

### III.

Finally, with regard to the Conservancy District's admitted 72-day delay, even after it had all possible knowledge, I agree with the majority that the absence of factual findings makes it impossible to tell "whether the 72-day delay was reasonably excusable." Judging by the District's knowledge of Commission procedure demonstrated in its *Mitchell Energy* application prior to May 5, 1981, it may be doubted that the District has any justifiable excuse for the delay here. *See* note 5 *supra*. As for the majority's discussion of the delay issue, it is simply gratuitous advice to the agency that exceeds our appellate authority.

---

**6.** Relying on the reasoning of the majority, it could be pointed out that the Commission also "implicitly ... determin[ed]" that notice to the general public, which also is demanded by the statute, did *not* require greater specificity than that provided by the published notice. The statute can be searched in vain for any indication that municipalities are entitled to more exact or more detailed notice than the general public. I believe the statute provides that municipalities and the rest of the public are entitled to the *same* information—but that municipalities are

entitled to have it sent to them while the public must read it in the papers.

**7.** I would reject any suggestion that the notice required by this particular statute must somehow be more exact or more detailed than the notice required by any other statute in which Congress has provided for personal service on interested parties. The statutory notice requirement at issue in this case is no more specific than the notice requirements that govern adjudications under the Administrative Procedure Act. *See* 5 U.S.C. § 554(b) (1982).

In sum, I would remand to the Commission for a hearing to determine:

1. Whether or not the Conservancy District, in view of its statutory inability to wholesale power and in light of this court's construction of the notice provision, was entitled to personal notice at the time the notice was sent out.

2. At what point the Conservancy District had sufficient actual knowledge of all the information to which it was entitled.

3. Whether the Conservancy District's delay after it received all of the knowledge to which it was entitled was reasonable.

4. The proper remedy to be applied.

5. If the District's application is to be considered timely, whether it is to be required to recompense Energenics for such loss as it suffered through the delay of the District.

In my opinion, this court should not issue substantive rulings on these issues until after the Commission has developed a factual record sufficient to provide a reasoned basis for our decision. At present, the court has ruled substantively on several issues on the basis of *mere allegations* by the Conservancy District. To rule substantively thereon is improper judicial procedure for an appellate court.